**I'll bIN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SAUL CASTANEDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. 16 C 10167 |
| | ) | |
| BOARD OF EDUCATION OF THE CITY | ) | Judge Virginia M. Kendall |
| OF CHICAGO, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Saul Castaneda sued his former employer, the Board of Education of the City of Chicago, after he was fired from his position as a second-grade teacher. Castaneda was terminated after a months-long decline in his teaching performance. During the suspension and termination proceedings, Castaneda was diagnosed with a mental illness.

Castaneda alleges that the Board discriminated against him in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* by failing to reasonably accommodate his disability and firing him because of his disability. Castaneda further alleges that the Board interfered with his rights under the Family and Medical Leave Act ("FMLA"), 28 U.S.C. § 2601 *et seq.* Castaneda now moves for partial summary judgment on the FMLA claim. The Board cross-moves for summary judgment on both the FMLA and ADA claims. For the following reasons, Castaneda's motion for summary judgment [49] is denied and the Board's motion for summary judgment [57] is denied.

# I.    STATEMENT OF FACTS

The parties do not dispute the facts below unless otherwise noted.  The facts are drawn from the parties' LR 56.1 statements of undisputed materials facts and supporting exhibits.[1]

### a.    Castaneda's Performance at Hanson Park Elementary School

The Board hired Castaneda in August 2013 as a probationary appointed teacher and assigned him to teach second grade at Hanson Park Elementary School ("Hanson Park").  (Dkt. 58 ¶¶ 2-3.)  Castaneda's first year teaching at Hanson Park, the 2013-2014 school year, was unremarkable.  Some of his colleagues testified that his teaching performance during the 2013-2014 school year was "fantastic" or "good," others testified that he did not make much of an impression on them.  (*Id.* ¶¶5-9; Dkt. 64 ¶¶5-9.)

In his second year at Hanson Park, the 2014-2015 school year, Castaneda's performance declined.[2]  (Dkt. 58 ¶ 10.)  His formal evaluations from the school year are uneven.  They include some positive remarks about his classroom management skills, rapport with students, and ability to handle student behavior, (*see* Dkt. 64 at 56 ¶ 6), and he received "proficient" ratings for managing student behavior and classroom procedures during the year. (Dkt. 50 ¶ 14.)  But Castaneda also received "unsatisfactory" ratings for designing coherent instruction, establishing a culture for

---

[1] *See* Dkt. Nos. 50, 56, 58, and 64.

[2] Castaneda disputes many of the Board's facts about the events of the 2014-2015 school year on a number of grounds. *First*, he disputes the Board's facts because his formal evaluations or other "Board records" do not refer to the conduct or events in question.  But Castaneda cannot controvert the Board's facts simply by pointing to records that do not corroborate those facts.  In particular, Castaneda disputes nearly all of the Board's facts about his classroom management and instructional problems by pointing to his performance evaluations, which contain some positive comments and do not explicitly mention the conduct in question.  Again, that these documents do not corroborate the Board's facts does not, without more, controvert the facts surrounding those specific events, which were all observed by testifying witnesses or otherwise documented. *Second*, Castaneda disputes virtually every fact about the 2014-2015 school year on the ground that his physician testified that he was experiencing psychotic symptoms "going back to summer/fall of 2014."  But Castaneda never explains how or why this controverts the Board's facts.  Presumably, Castaneda offers the fact to excuse or explain his behavior.  Regardless, he cannot controvert the Board's facts on that ground. *Finally*, Castaneda disputes many of the Board's facts on the ground that he does not recall certain events or conversations because he was suffering from untreated mental illness when they took place.  Personal knowledge is not required to controvert a fact, and Castaneda is obligated to present evidence to contest the Board's facts.  Facts that are disputed solely on these grounds, or a combination of them, have been deemed admitted.

learning, and engaging students in learning. (Dkt. 56 ¶ 35; 56-8 at 2.) His overall rating for the school year was "Developing." (Dkt. 58 ¶ 76; Dkt. 56-8 at 1.)

Observations from Castaneda's colleagues and supervisors over the course of the 2014-2015 school year paint a much bleaker picture. That year, a special education teacher at Hanson Park observed Castaneda's teaching and noticed that he was frequently not instructing his class. (Dkt. 58 ¶¶ 7, 13.) She noticed that Castaneda stepped out of the classroom on a daily basis and that his students were frequently playing in Castaneda's classroom or in the hallway. (*Id.*) When she asked Castaneda why he was leaving his students in his classroom to play unattended, Castaneda told her that the students "[were] old enough, they can handle it" and that he was "keeping an ear to them." (*Id.*) In October 2014, the same teacher again asked Castaneda what was going on. (*Id.* ¶ 14.) He told her he didn't feel the need to instruct his students and that instead "they should be playing; [to] learn through play . . ." (*Id.*) He also told her that because his students could not play outside in their neighborhoods, "it was necessary for them to play in the classroom." (*Id.*) The teacher noticed a lack of instruction in Castaneda's classroom throughout the 2014-2015 school year. (*Id.* ¶ 15.)

Another of Castaneda's colleagues observed what she described as "erratic behavior" during the 2014-2015 school year. In one instance, she saw Castaneda standing on top of his desk, staring out the window and talking about clouds, while the students in his classroom ran around. (*Id.* ¶ 17.) Around December 2014, she saw Castaneda put his headphones on, face away from his class, and allow students to have "play time" all day. (*Id.*) She asked Castaneda if he was okay or if she could help him. (*Id.* ¶ 18.) Castaneda responded that he was fine and did not need any help. (*Id.*)

In January 2015, Castaneda met with David Belanger, the Hanson Park principal, and Es-merelda Roman, the vice principal, to discuss Castaneda's classroom management, lack of instruc-tion, and lack of drive, energy, and desire in the classroom. (*Id.* ¶¶ 4, 19; Dkt. 50 ¶ 17.) A week later, vice principal Roman did a spot check of Castaneda's classroom and saw that his students were playing with cars or watching YouTube videos on the computer while Castaneda sat at his computer with his back to the students. (Dkt. 58 ¶ 20.) When Roman asked Castaneda why he was not instructing his students, he told her that "they are learning" and continued working at his computer. (*Id.*) In February and March 2015, Castaneda failed to turn in data required to measure student benchmarks, despite repeated requests from school staff. (*Id.* ¶ 22.) Around this time, he began showing up late to work—between February 3 and May 5, 2015, Castaneda arrived to work late fourteen times. (*Id.* ¶ 23.) At some point between January and April 2015, Castaneda told Belanger and Roman that he was "burnt out" and "worked too hard" during the 2013-2014 school year and that he was "not going to burn [him]self out again" during the 2014-2015 school year. (*Id.* ¶ 21.) He also told Belanger and Roman that rather than follow the chosen curriculum, he believed children should "learn through play." (*Id.* ¶ 24.)

On April 1, 2015, Belanger invited Castaneda to attend a confidential meeting on April 15, 2015 to discuss Belanger's concerns with Castaneda's performance and ensure that Castaneda un-derstood Belanger's expectations regarding classroom duties and tardiness. (*Id.* ¶ 25.) By April 8, 2015, at the latest, Belanger decided not to renew Castaneda's employment as a teacher at Han-son Park for the 2015-2016 school year because Belanger believed Castaneda's students were not receiving the instruction they needed to prepare them for third grade. (*Id.* ¶ 26; Dkt. 64 ¶ 26; Dkt. 58-4 at 78:1-15; 84:1-8.) Belanger testified that non-renewal meant "maybe [Hanson Park] wasn't the right fit," but that non-renewal would not prevent an employee from getting a job elsewhere

with Chicago Public Schools. (Dkt. 64 at 59 ¶ 22; Dkt 50-1 at 175:5-12.) At the April 15 meeting, Belanger noted that Castaneda "seemed rather aloof and . . . not quite sure why we were having the meeting." (Dkt. 58 ¶ 27.)

On April 16, 2015, two students were injured while playing in Castaneda's classroom. (*Id.* ¶ 30.) One student said that while Castaneda gave the class free time, the student was chasing a classmate around the room, tripped, fell into a desk, and injured his leg. (*Id.*) The second injured student said he was running out of Castaneda's classroom when he tripped and fell, causing a bump on his head. (*Id.*) The second student also reported that he was playing with a friend because Castaneda gave the class free time. (*Id.*) The Board did not create Incident Reports for the two student injures until May 11, 2015, after Castaneda's termination proceedings were underway. (Dkt. 50 ¶ 23.)

The next day, on Friday, April 17, 2015, while Castaneda was dropping his students off at the school gym for PE class, Castaneda asked the school PE teacher if "we've been here before" and said that a friend of his told him "we've all been reincarnated." (Dkt. 58 ¶ 32.) The PE teacher thought it was an "awkward exchange" and that perhaps Castaneda was "embarrassed" because he couldn't explain himself correctly. (*Id.* ¶ 33.) Castaneda then stood in the gym doorway and watched PE class, which he had never done before. (*Id.*) The PE teacher reported the event to school administration via email and in person to vice principal Roman. (*Id.*; Dkt. 58-13.) The PE teacher noted in the email that even though Castaneda had acted "very awkwardly" toward him in the past, this incident "was the first time [he] felt uncomfortable to the point where [he] felt that [Castaneda] might be capable of something bad." (Dkt. 58 ¶ 33; Dkt. 58-13; Dkt. 64 ¶ 33.) He also reported that the exchange made him feel "extremely uncomfortable and scared" and that he

did not want to turn his back on Castaneda while Castaneda was standing in the doorway watching PE class. (Dkt. 58-13; Dkt. 64 ¶ 33.)

On the same day, a teacher emailed principal Belanger to report that students were running around Castaneda's classroom, standing on desks and chairs, and roughhousing. (Dkt. 58 ¶ 34.) She said she heard loud crashing sounds and that a student was "going to get seriously hurt." (*Id.*) That same day, a different teacher said she saw Castaneda standing on top of his desk staring out the window. (*Id.* ¶ 35.) Another teacher reported seeing him "standing on a ledge or his desk watching as the children played on the floor." (*Id.*) That teacher emailed principal Belanger later that night to relay what she had seen and told Belanger that she was "a bit concerned about [Castaneda's] mental state." (Dkt. 50 ¶ 25.)

The following Monday, April 20, 2015, principal Belanger notified the Board's then-Chief Labor Relations Officer, Joseph Moriarty, that he was concerned about the safety of Castaneda's students and relayed emails from Castaneda's colleagues about Castaneda's behavior, attitude, and classroom management. (Dkt. 58 ¶ 36.) He noted that two students were injured in Castaneda's classroom due to lack of supervision, that school administration had many conversations with Castaneda about his classroom management throughout the school year, and that Castaneda was tardy and failed to complete required tasks. (*Id.*) Belanger sent Moriarty statements from Hanson Park teachers about the PE class incident, the instances in which teachers saw Castaneda standing on top of his desk, and many occasions of Castaneda's failure to supervise or instruct his students. (Dkt. 58-14.) Belanger also sent Moriarty summaries of some of vice principal Roman's interactions with Castaneda, including one in January 2015 in which Roman noted that she mentioned to Castaneda that his students played games all day while he sat with a "puzzled look" and didn't interact with his students. (Dkt. 50 ¶ 29.) Roman noted that she asked Castaneda when he would

begin instructing the class, and he responded that he didn't know and "b[egan] to giggle." (*Id.*) Belanger told Moriarty that Castaneda's "behavior is peculiar and off. He does not appear to be under the influence of alcohol, however his behavior is increasingly strange and worries many teachers who work with him in regards to the safety of his students." (*Id.* ¶ 28.)

The next day, April 21, 2015, vice principal Roman told Belanger that Roman met with a parent of a Hanson Park student to discuss the parent's concerns about Castaneda. (Dkt. 58 ¶ 37.) According to Roman, the parent said that Castaneda "wasn't himself" during a parent-teacher conference and looked puzzled when she asked Castaneda how her child was doing. (Dkt. 50 ¶ 31; Dkt. 58-16.) The parent said that she could see that Castaneda "was not with it," but could not "pinpoint what the problem [wa]s." (*Id.*) Belanger forwarded Roman's report of the parent's complaint to Moriarty and another Board administrator the next day, again expressing his concern about Castaneda's "bizarre behavior" and the safety of Castaneda's students. (*Id.* ¶ 32.)

Beginning on April 21, 2015, Belanger hired a retired teacher to assist Castaneda in his classroom. (Dkt. 58 ¶ 28; Dkt. 50 ¶ 30.) The retired teacher sometimes took over Castaneda's class and modeled instruction strategies while Castaneda watched. (Dkt. 58 ¶ 28.) One of Castaneda's colleagues, however, observed that Castaneda did not pay attention to the retired teacher and instead sat with his head down, graded papers, or did other things instead of watching the retired teacher's classroom instruction. (*Id.* ¶ 29.) The colleague also observed that as soon as the retired teacher left Castaneda's classroom, he let the students play freely and did not instruct or pay attention to them. (*Id.*)

### b. Castaneda's Investigatory Conference

On April 23, 2015, the Board notified Castaneda that an investigatory conference would be held on May 6, 2015. (Dkt. 58 ¶ 39.) The Board's letter specified that the conference was being held because Castaneda "committed numerous acts of egregious misconduct including, but

not limited to, failing to supervise students, resulting in students sustaining injuries." (*Id.*) The letter also indicated that the conference could result in Castaneda's termination from Chicago Public Schools. (*Id.*)

Castaneda attended the May 6, 2015 investigatory conference before Board hearing officer Mary Ernesti. (*Id.* ¶ 41.) His Chicago Teacher's Union representative, Annette Rizzo, attended the conference with him. (*Id.*) Toward the beginning of the investigatory conference, the transcript reflects that the following exchange took place:

> MS. RIZZO: … [Castaneda] is not on any medication that would affect his behavior. He feels that he is very sleep-deprived from the demands on his job. And I'm going to state this, but then he will have to state it on his own. I think that in our discussion, it's agreed that perhaps he seek a medical leave and try to explore some of the problems he may be having. A medical leave.
>
> HEARING OFFICER ERNESTI: Okay.
>
> MR. CASTANEDA: This option is the – for medical leave?
>
> MS. RIZZO: For a medical leave. It would be – when you apply for the leave, as I explained to you, a physician fills out the majority of the application. So there has to be medical documentation. I suggested that you bring this to a physician, and I suggested a mental healthcare physician to review.
>
> MR. CASTANEDA: My mental state?
>
> MS. RIZZO: Correct. Unless you have physical needs that we're not aware of or – you don't have to share that with us. Under the HIPAA laws, you don't have to share any medical condition you may have. If you don't feel that the medical route is the best for you, we would need some answers to these observations of your performance.
>
> MR. CASTANEDA.: Well, the medical route would be the – what I would prefer.
>
> HEARING OFFICER ERNESTI: Okay. Well, we're here in the context of an investigatory conference . . . . If you also want to pursue a medical leave, that's certainly something that you're entitled to do as a CPS employee. But for purposes of our investigatory conference, I do need a response to the [. . .] allegations.

(Dkt. 58-22 at 13:20-15:15; *see also* Dkt. 64 ¶ 47.) Ernesti then outlined the allegations of misconduct against Castaneda and gave him a chance to respond. (Dkt. 58 ¶ 41.) Regarding the two students injured in his classroom on April 17, Castaneda said one student told him he was injured in gym class, not in Castaneda's classroom. (*Id.* ¶ 42.) Castaneda said the other student's injury was "very minor." (*Id.*) He later stated that he did not remember the injuries at all. (*Id.*) When asked about his colleagues' concerns about his classroom management and supervision skills, Castaneda said he didn't think it was a problem. (*Id.* ¶ 43.) When asked about his colleagues' reports that Castaneda was seen standing on his desk, Castaneda explained that he sometimes stood on his desk to cover exposed pipes in the walls so students would not burn themselves, or to open windows, and that his colleagues misinterpreted what they saw. (*Id.* ¶ 44.) Castaneda denied talking about reincarnation and said the PE teacher had fabricated the incident. (*Id.* ¶ 46.) During the investigatory conference, Castaneda never mentioned mental illness as a cause of the incidents or the behavior at issue. (*Id.* ¶ 47.)

After the investigatory conference, Ernesti prepared and sent a summary memorandum to Board personnel, dated May 12, 2015, in which she noted Castaneda's blanket denials, lack of explanation for the events at issue, and insistence that colleagues fabricated conversations. (*Id.* ¶ 48.) Ernesti did not find Castaneda's explanations to be credible. (*Id.*) Ernesti also noted that Castaneda "displayed a troubling lack of awareness" of the purpose of the conference, had "little recall regarding events that took place less than 3 weeks ago," and had "little interest" in participating in the conference. (Dkt. 50 ¶ 37.) She further noted that "[i]f Mr. Castaneda's behavior during the conference is an indication of his state of mind while he has a classroom of second graders under his supervision, it is understandable why so many of his fellow teachers came forward to share their concerns regarding his classroom management skills and the potential for

students to get hurt." (*Id.*) Ernesti's memorandum recommended that Castaneda's employment be terminated and that a "Do Not Hire" designation be placed on his record. (Dkt. 58 ¶ 49.)

### c. Castaneda's Application for Leave and Notice of Suspension Pending Termination

Immediately after the investigatory conference, Castaneda filed a claim with Sedgwick, the Board's third-party administrator, requesting short-term disability leave and concurrent leave under the FMLA.[3] (Dkt. 50 ¶ 38.) The next day, on May 7, 2015, Sedgwick found that Castaneda was eligible for both short-term disability and FMLA leave, and conditionally approved him for both. (*Id.* ¶ 42.) His FMLA leave was conditionally approved from May 6, 2015 to June 4, 2015. (Dkt. 58 ¶ 53.) Sedgwick sent Castaneda a letter that day identifying it as the administrator for the Board's short-term disability plan and informing Castaneda of his rights and responsibilities under the FMLA and of the eligibility requirements for FMLA leave. (*Id.* ¶ 54.)

That same day—May 7, 2015, the day after the investigatory conference—Thomas Krieger, the Board's then-Assistant Director of Employee Engagement, sent Castaneda a letter informing him that there was a sufficient basis to terminate his services as a probationary appointed teacher in the Chicago Public Schools and that he was suspended without pay, effective May 11, 2015. (*Id.* ¶ 50.) The letter also stated that if the Board adopted Krieger's recommendation, Castaneda would be terminated. (*Id.*)

---

[3] The Board disputes that Castaneda's application included a request for leave under FMLA on the ground that the record does not support that factual assertion. *See* Dkt. 55 ¶ 38. But Castaneda submitted a sworn declaration testifying that he did so. *See* Dkt. 50 ¶ 38; 50-1 at 6 ¶ 9. The Board seems to be arguing, then, that the record does not contain any evidence to corroborate Castaneda's declaration. But Castaneda need not present any corroborating evidence. A non-moving party may rely on his own affidavit testimony to defeat summary judgment, even if the testimony is "uncorroborated and self-serving," as long as it does not contradict any prior sworn statement. *United States v. Funds in Amount of One Hundred Thousand One Hundred and Twenty Dollars ($100,120.00)*, 730 F.3d 711, 718 (7th Cir. 2013) ("To reject testimony because it is unsubstantiated and self-serving is to weigh the strength of the evidence or make credibility determinations—tasks belonging to the trier of fact."). The Board does not identify any such prior sworn statement. The Court deems Castaneda's assertion admitted.

At 2:48 p.m. that afternoon, Sedgwick notified principal Belanger via email that Castaneda had filed a claim for short-term disability leave the day before. (*Id.* ¶ 52.) Sedgwick's email contained no information about the nature of Castaneda's disability claim. (*Id.*) At 5:02 p.m., Belanger forwarded the Sedgwick notification email to Krieger. (Dkt. 50 ¶ 40; Dkt. 50-1 at 170.) Five minutes later, Krieger responded and informed Belanger that he had sent Castaneda's "suspension without pay letter" earlier that day, and that the Board would consider Krieger's recommendation to terminate Castaneda at the next Board meeting in June, adding that "this leave application may change the analysis." (Dkt. 50 ¶ 40; Dkt. 50-1 at 170.) Belanger responded to Krieger later that evening and stated, "I'm wondering if CTU advised [Castaneda] to take this route or if his family/friends finally got through to him that something was truly wrong with his mental state." (Dkt. 50 ¶ 41; Dkt. 50-1 at 170.)

### d.      Castaneda's Diagnoses

On May 8, 2015, Castaneda met with Howard Pollack, a behavioral health specialist and licensed clinical social worker. (Dkt. 58 ¶ 57.) According to Pollack's report of their meeting, Castaneda told Pollack that he was a teacher facing disciplinary action and was "applying for short term disability insurance." (*Id.*) Pollack's report also states that Castaneda "expressed himself in a coherent manner" and was "oriented to time place [and] person." (*Id.* ¶ 58.) Pollack testified that though Castaneda described symptoms during their meeting, he did not show or demonstrate any symptoms, and that Castaneda "looked like a normal guy" and was "at the level where he could communicate in a lucid way." (*Id.* ¶ 61.) Pollack also testified that his report noted an incongruity between Castaneda's behavior at the meeting and the severity of the symptoms he described. (*Id.* ¶ 59.) On the date of their meeting, Pollack completed and signed a form indicating that Castaneda was unable to work as of May 8, 2015. (*Id.* ¶ 64.) The form stated that Castaneda

was "suffering from delusions," felt he was "being spied upon," saw "crosses in people's eyes," and had "suicidal ideations." (Dkt. 50 ¶ 45.)

On May 8, 2015, Castaneda also saw Dr. Mark Johns, a psychologist, for the first time. (Dkt. 58 ¶ 66.) Dr. Johns' notes from his diagnostic evaluation that day stated that Castaneda's "provisional diagnosis appear[ed] to be F20.0 Schizophrenia, paranoid type." (*Id.*) Dr. Johns later changed the diagnosis to "F33.3 Major Depression." (*Id.*) Dr. Johns submitted an "Attending Physician Statement" to Sedgwick, dated May 19, 2015, that deemed Castaneda "unable to work at this time" and listed his "projected return-to-work date" as September 1, 2015. (*Id.* ¶ 78; Dkt. 50 ¶ 54.) Dr. Johns' notes on the form indicate that Castaneda was experiencing "paranoid idea-tion," "delusional thoughts," and visual hallucinations. (Dkt. 50-1 at 240.) Under "Diagnostic Impressions," the form listed "295.3 Paranoid Schiz." (Dkt. 50 ¶ 54; Dkt. 50-1 at 240.) Castaneda testified during his deposition that May 8, 2015 was the first time he became aware that he had a mental illness. (Dkt. 58 ¶ 56; Dkt. 58-3 at 41:10-12.)

### e.     Castaneda's Leave Denial and Final Termination

On the evening of May 11, 2015, Krieger informed Kerry Frank (a Board employee who functioned as the liaison between the Board and Sedgwick) that Castaneda had recently applied for leave, but that he had been suspended without pay and was being recommended for dismissal as a result of the May 6 investigatory conference, and that in Krieger's opinion, Castaneda was "not eligible for a leave since he is no longer in pay status, nor is he still reporting for work." (Dkt. 50 ¶ 47.) Minutes later, Frank sent Sedgwick an email stating that Castaneda had been "suspended without [] pay" and was "not eligible for a leave since he is no longer in pay status." (*Id.* ¶ 49; Dkt. 50-1 at 232.) The next day, on May 12, 2015, Sedgwick informed Castaneda that his claim for short-term disability was denied because he "[was] an ineligible class *e.g.*: part time employee; therefore, you are not eligible to receive benefits under the Plan." (Dkt. 58 ¶ 68.) Castaneda

appealed the denial and contested the reasoning in the letter. (*Id.* ¶ 69.) His appeal was denied. (*Id.* ¶ 70.)

On May 14, 2015, Castaneda emailed principal Belanger and Board personnel, stating that he was "seeking the help of a medical provider" and had been staying home from work since the May 6 investigatory conference due to his "medical provider's diagnosis and recommendation." (Dkt. 50 ¶ 52.) He also expressed confusion over the May 7 "suspen[sion] without pay" letter, because he believed that "according to FMLA, [he had] job protection for a period of 12 work weeks." (*Id.*) He asked if the suspension letter had been sent in error. (*Id.*) No one responded to Castaneda's email. (*Id.*) On June 10, 2015, Castaneda emailed Belanger and asked for his assistance "submitting documentation to assist a teacher with a perceived mental disability." (*Id.* ¶ 57.) No one responded to his email. (*Id.*)

On June 26, 2015, the Board sent Castaneda a letter informing him that it had approved his termination and that he was not eligible for future employment with the Board. (Dkt. 58 ¶ 72.) The letter stated that the dismissal "superseded" Castaneda's non-renewal. (Dkt. 50 ¶ 61.) On July 8, 2015, Castaneda contacted the Board's Equal Opportunity Compliance Office to request an accommodation. (Dkt. 58 ¶ 72.)

### f. Castaneda's Continued Treatment and Subsequent Employment

Castaneda continued treatment with Dr. Johns. Dr. Johns' notes from later sessions with Castaneda state that on January 26, 2016, Castaneda told Dr. Johns that he was "avoiding looking for work," that he was "worried he would not be fit to resume a full-time position," and that he was "concerned that stressors related to work could result in relapse of psychotic symptoms." (*Id.*; Dkt. 58-32 at 7.) On March 2, 2016, Dr. Johns' notes reflect that Castaneda said he was "still avoiding looking at prospects for work" and that he found "even the thought of it very overwhelming." (*Id.*) On March 29, 2016, Dr. Johns' notes reflect that Castaneda reported that he "'almost'

fe[lt] ready to look for work options." (*Id*; Dkt. 58-32 at 8.) At his deposition, Dr. Johns was asked if Castaneda would have been ready to return to work by September 1, 2015. (Dkt. 66-1 at 20; 56:15 – 57:24.) Dr. Johns testified that:

> "with support and continued treatment, [Castaneda] could have returned to work. He may have needed accommodations at that time, but it was not necessary to eval-uate because he didn't return to work . . . as I'm reading my notes, I can't see why he couldn't return to work with continued treatment . . ." (*Id.*)

Later in the deposition, when asked again if Castaneda could have returned to work on September 1, 2015, Dr. Johns testified:

> "Looking at my notes, I believe he could have gone back for the fall, the startup of the fall school year . . . . I would have had to have assessed for any accommoda-tions. So I don't necessarily know if he could have handled the rigors of a full-time class . . . I think he could have gone back full-time with continued monitoring and evaluation.
>
> Q: So without accommodation?
>
> A: That's what I can't assess. I know that he would have to – he would do better if he had a low-stress environment. I can't imagine a classroom being a low-stress environment. So that's why I'm qualifying my opinion. . . ." (*Id.* 105:12 – 106:9.)

Castaneda testified in his deposition that he began looking for work after he was terminated and that he was able to work as of September 1, 2015. (Dkt. 64 at 64 ¶ 38.) Castaneda secured part-time teaching positions in the Glenview School District in September 2016. (*Id.*; Dkt. 58-3 at 187:1-24.) The Board's 2014-2015 school year for teachers ended on June 23, 2015. (Dkt. 58 ¶ 1.) The Board's 2015-2016 school year for teachers began on August 31, 2015. (*Id.*) Castaneda did not teach summer school for the Board. (Dkt. 64 at 59 ¶ 23.)

## II.    DISCUSSION

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine factual dispute exists if a reasonable jury could find for either party. *Pagel v.*

*TIN Inc.*, 695 F.3d 622, 626 (7th Cir. 2012). A material fact is one that affects the outcome of the suit. *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). To survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of his case. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate. *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). On summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-moving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). If the parties cross-move for summary judgment, the Court "take[s] the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party." *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016).

      a.     **ADA Claims**

Castaneda alleges both that he experienced disparate treatment because of his disability and that the Board failed to accommodate his disability.

      i.     **Disparate Treatment**

The ADA prohibits employers from discriminating against a "qualified individual on the basis of disability." 42 U.S.C. 12112(a). To defeat summary judgment on an ADA discrimination claim, a plaintiff must point to evidence sufficient to establish that (1) he is a qualified individual with a disability under the meaning of the ADA; (2) he is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) he suffered an adverse

employment decision as a result of his disability. *Guzman v. Brown County*, 884 F.3d 633, 641 (7th Cir. 2018).

### 1.    Qualified Individual

The Board first argues that Castaneda cannot show that he was qualified to perform the essential functions of the job with or without a reasonable accommodation, because the accommodation he required was not reasonable. According to the Board, Castaneda filed for medical leave on May 6, 2015, and Dr. Johns, his treating physician, stated that Castaneda could not return to work until September 1, 2015. However, the Board asserts that Dr. Johns' treatment notes in fact reveal that Castaneda could not return to work until March 29, 2016, when Castaneda told Dr. Johns that he "almost fe[lt] ready to look for work options." Thus, the Board argues, Castaneda required a leave of 46 weeks, which cannot constitute a reasonable accommodation under the ADA. Castaneda does not dispute that his physician stated that he could return to work on September 1, 2015, and Castaneda himself testified that he was ready to return to work on that date. Castaneda asserts that he needed "only around seven weeks of leave" (*i.e.*, from May 6, 2015 through the last day of the school year—June 23, 2015) because he did not teach summer school and thus the period from June 23, 2015 to August 31, 2015 (the start of the next school year) should not count as part of his leave. He argues, then, that he is a qualified individual because he would have been able to perform the essential functions of his job if granted a seven-week leave as an accommodation. The Board counters that, even if Castaneda needed only a seven-week leave (a conclusion that the Board maintains is not supported by the record), that length of leave still does not constitute a reasonable accommodation under the ADA.

Under the ADA, a reasonable accommodation "is expressly limited to those measures that will enable the employee to work. An employee who needs long-term medical leave *cannot* work and thus is not a 'qualified individual' under the ADA." *Severson v. Heartland Woodcraft, Inc.*,

782 F.3d 476, 479 (7th Cir. 2017) (emphasis in original) (citation omitted). "[A] medical leave spanning multiple months does not permit [an] employee to perform the essential functions of his job. To the contrary, the '[i]nability to work for a multi-month period removes a person from the class protected by the ADA." *Id.* at 481.

The parties clearly dispute the length of leave Castaneda required, which is a material fact for purposes of determining whether he was qualified to perform the essential functions of his job. Castaneda presented evidence—namely, his testimony and the testimony of Dr. Johns—that he could return to work on September 1, 2015. Castaneda also presented evidence that, because he did not teach summer school for the Board, he required only seven weeks away from work. The Board cites evidence in the record to the contrary, but viewing the evidence and all reasonable inferences in Castaneda's favor, the Court determines that Castaneda has presented sufficient evidence to create a genuine factual dispute as to whether he was qualified to perform the essential functions of his job with or without a reasonable accommodation. The Court thus denies the Board's motion for summary judgment on this basis.

### 2. Awareness of Castaneda's Disability

The Board next argues that even if Castaneda can show he was a qualified individual, summary judgment is still warranted on his disparate treatment claim because the Board did not have notice of his disability. The Board contends that it did not learn of Castaneda's disability until after it had already decided not to renew his employment and then separately decided to suspend him indefinitely pending termination. If the Board was not *aware of* Castaneda's disability, the argument goes, the Board could not have terminated him *because of* his disability. Castaneda responds that what the Board knew when it decided not to renew him in April or suspended him and recommended terminating him in May is irrelevant—instead, what matters is what the Board knew when it definitively terminated him in June. Though the parties dispute the legal significance

of what the Board knew and when it knew it, the facts surrounding the process of Castaneda's termination and the Board's knowledge of Castaneda's medical condition are largely undisputed, and those that are disputed are not material.

The Board relies extensively on a district court decision, *Spurling v. C & M Fine Pack, Inc.*, No. 11 CV 39, 2013 WL 655136 (N.D. Ind. Feb. 21, 2013), for the proposition that it did not discriminate against Castaneda because it did not have notice of Castaneda's disability when it decided not to renew or terminate him. In *Spurling*, the district court held, on a motion for reconsideration, that an employer was not liable for discrimination where the employer learned of an employee's disability only "after the wheels [of termination] had begun turning"—*i.e.*, after a termination recommendation was made, but before the termination was unequivocally conveyed to the employee or became effective. *Id.* at *3. In other words, the district court in *Spurling* found that for purposes of ADA discrimination, all that matters is what the employer knows when it *decides* to terminate an employee—not what the employer knows later when it conveys that decision or what it knows when that decision becomes effective. *Id.*

The Seventh Circuit overturned the underlying decision in *Spurling* and expressly rejected the district court's reasoning that the Board seeks this Court to espouse. In doing so, the Seventh Circuit explained that for purposes of an employer's notice of an employee's disability under the ADA, "termination occurs when the employer shows, by acts or words, clear intention to dispense with the employee's services." *Spurling v. CM Fine Pack, Inc.*, 739 F.3d 1055, 1060-61 (7th Cir. 2014) ("*Spurling II*"). "There are two prongs to the test, both of which must be satisfied to fix the date of termination. 'First, there must be a final, ultimate, nontentative decision to terminate the employee . . . . Second, the employer must give the employee "unequivocal" notice of its final

termination decision.'" *Id.* at 1061 (quoting *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004)).[4]

The fact that an employer learns of an employee's disability only after deciding to terminate him, or even after taking concrete steps in the termination process (such as beginning a termination investigation, formally recommending termination, or suspending an employee pending termination), does not, as the Board contends, absolve the employer of liability for discrimination under the ADA. *Id.* Instead, the Court must look to what the employer knows when the employee is actually terminated. *Id.* It is undisputed that Castaneda was not "unequivocal[ly]" informed of the Board's "final, ultimate, nontentative" termination decision until June 26, 2015. The parties do not dispute that Castaneda applied for short-term disability benefits on May 6, 2015 and that the Board learned of his application the next day. Nor do they dispute that Castaneda emailed Board personnel on May 14, 2015 to notify them that he was seeking medical treatment and staying home from work due to his medical provider's diagnosis and recommendation.

It is true that in *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995), which the Board also relies on, the relevant date for purposes of an employer's knowledge of an employee's disability was the date of the termination decision, not the date the employee was unequivocally informed of the final termination decision. But as the *Spurling II* court explained, *Hedberg* is distinguishable from these facts. "*Hedberg* stands for the well-established principle that an employee cannot hold an employer liable under the ADA if the employer has no knowledge of the employee's disability." *Spurling II*, 739 F.3d at 1060-61 (distinguishing *Hedberg*, 47 F.3d at 932.) But, like here, the "actual issue" in *Spurling II* was whether the employer's actions

---

[4] The Board argues that *Flannery's* holding is limited to the timeliness inquiry for statute of limitations purposes and is not relevant for determining whether an employer had notice of an employee's disability before the employee was terminated. *Spurling II* holds otherwise. 739 F.3d at 1061.

"sufficed to terminate" the employee, and what the employer knew when it took actions sufficient to terminate. *Id.* *Spurling II* holds that an employer cannot prevail on summary judgment by claiming that it decided to terminate an employee before learning of the employee's disability, even though the employer later learned of the disability before the termination was final. *Id.* It is not disputed that is what happened here. Accordingly, the Court denies the Board's motion on this basis.

### 3. Causation

Even though the Board cannot prevail on its termination-timing argument, that does not end the causation analysis for Castaneda's disparate treatment claim. To survive summary judgment, Castaneda must present evidence that, considered as a whole, "would permit a reasonable factfinder to conclude that [his] race, ethnicity, sex, religion, or other proscribed factor [including disability] caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). If an employer can offer a legitimate, non-discriminatory reason for the adverse action, the plaintiff must provide some evidence that the reason is pretextual. *See David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). In the end, the Court must evaluate all the evidence together and determine whether it would permit a reasonable factfinder to conclude that Castaneda suffered an adverse employment action because of his disability. *Id.* at 222-23; *see also id.* at 224 ("In adjudicating a summary judgment motion, the question [is]: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?")The Board argues that Castaneda cannot make such a showing, because the record demonstrates that he was fired for misconduct and poor performance, not because of his disability.

In support of his bid, Castaneda points to principal Belanger's email where, in response to learning about Castaneda's request for short-term disability leave, Belanger wonders if

Castaneda's "family/friends finally got through to him that something was truly wrong with his mental state." Castaneda argues that this reveals that Belanger "long-believed" Castaneda had a mental health problem. Castaneda also cites Krieger's email noting that Castaneda's request for short-term disability leave may "change the analysis" regarding his termination, and argues that a reasonable jury could view the email as evidence of disability discrimination. Castaneda also points to the suspicious timing of the Board's May 7, 2015 decision to terminate him, which came just one day after the investigatory conference, where he claims he requested a medical leave to address his mental health issues. Until the conference, the Board had merely decided not to renew his employment. One day after the conference and his request for leave, the Board decided to terminate him. Castaneda argues that a reasonable jury could find the timing indicative of discrimination. Finally, Castaneda argues that the Board's stated reasons for terminating him are pretextual and "unworthy of belief." He points to formal evaluations from the 2014-2015 school year in which he was rated "basic" or "proficient" in categories related to classroom management, and some positive comments from the evaluations about his classroom management and teaching skills. He claims that his formal evaluations reflect no issues with his classroom management skills, which renders the Board's claimed reason for terminating him beyond belief. In support of his argument that the Board's reasons for terminating him were pretextual, Castaneda points to the fact that principal Belanger testified during his deposition that other students had received "bumps and bruises" in the classroom in the past, and those teachers had not been disciplined. According to Castaneda, there is "no contemporaneous evidence" of the student injuries at issue in his investigatory conference, and a reasonable jury could thus determine that the Board's reasons were pretext for discrimination.

The Board argues that the record instead demonstrates the "inescapable conclusion" that Castaneda was fired because of his poor performance and misconduct, including his tardiness, his lack of classroom supervision, resulting in student injuries, his "refusal to teach," and his failure to turn in student work or test scores. In response to the evidence offered by Castaneda, the Board claims that Belanger's email commenting on Castaneda's "mental state" was merely that—a comment on the *symptoms* of Castaneda's disability, which does not amount to an admission that it fired him because of his disability. The Board also points to the fact that when confronted about his behavior, Castaneda did not tell Board personnel that his poor performance was caused by his mental health issues, but offered other explanations instead—*e.g.*, that he preferred to allow his students to "learn through play," that he did not want to burn himself out again, and that many of his colleagues' reports were fabricated. As to Castaneda's suspicious-timing argument, the Board responds that Castaneda merely referred to his "mental state" during the investigatory conference, and never explicitly blamed his behavior on "a *mental disability*," and so any of the Board's decisions flowing from the conference could not have been "because of" Castaneda's disability. As to the claim that its stated reasons for terminating Castaneda are "unworthy of belief," the Board points to the many negative aspects of Castaneda's performance evaluations, including that he was rated "unsatisfactory" in seventeen of nineteen review criteria. Finally, the Board argues that Castaneda has not established that its reasons were pretextual, because Castaneda has not identified proper comparators—*i.e.*, teachers who performed similarly to him and engaged in similar misconduct but were treated more favorably than him.

Considering this evidence as a whole, a reasonable factfinder could conclude that Castaneda was fired because of his disability. It is a close call, and the Board presented evidence demonstrating that Castaneda failed to meet expectations, showed up to work late, and received

mediocre performance reviews, that his behavior worried his colleagues and supervisors, that his lack of classroom management led to student injuries, and that his principal determined that his lack of classroom instruction was detrimental to students. But to survive summary judgment, Castaneda does not have to present evidence sufficient to establish that his version of events is the *only* possible conclusion—just that the evidence *could* permit a jury to find in his favor. A reasonable jury could conclude, based on all the evidence, that the Board fired Castaneda because he was disabled rather than because of his poor performance and misconduct. Castaneda presented evidence that could support a jury finding that the Board's decision to terminate him (rather than simply not renew him) on May 7, 2015 was a direct reaction to his request for medical leave just one day earlier at the investigatory conference. Though "suspicious timing alone is rarely enough to survive summary judgment," it is "relevant evidence that can raise a genuine issue of fact about discrimination." *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013); *see also, e.g.*, *Harden v. Comcast*, No 16 C 1931, 2018 WL 6621397, at *3 (N.D. Ill. Dec. 18, 2018) (finding that suspicious timing of performance audit just after plaintiff's medical leave created genuine issue of fact as to causation for disability discrimination claim). Castaneda also points an email by Board personnel noting that his request for medical leave could "change the analysis" regarding his termination. A jury could find that this not only demonstrates the Board's awareness of Castaneda's disability, but also that the Board acknowledged the potential liability from its decision to terminate Castaneda after he requested a medical leave. This evidence could allow a reasonable jury to find that the Board knew its decision to terminate Castaneda was premised on his disability. Because Castaneda has created a triable issue of fact on the question of whether he was terminated

because of his disability, the Court denies the Board's motion for summary judgment on Castaneda's ADA disparate treatment claim.

### ii.     Failure to Accommodate

Under the ADA, discrimination also includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. 12112(b)(5)(A); *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241 (7th Cir. 2018). To prevail on a failure-to-accommodate claim, a plaintiff must show that (1) he is a qualified individual with a disability; (2) his employer was aware of his disability; and (3) his employer failed to reasonably accommodate his disability. *Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014).

### 1.     Qualified Individual

For the reasons stated in Section II(a)(i)(1) above, Castaneda has presented sufficient evidence to create a genuine factual dispute as to whether he was qualified to perform the essential functions of his job with or without a reasonable accommodation. The Court thus denies the Board's motion for summary judgment on this basis.

### 2.     Awareness of Castaneda's Disability

As it did in response to Castaneda's disparate treatment claim, the Board similarly argues that it cannot be liable for failing to accommodate Castaneda's disability if it was not aware of the disability in the first place. The Board argues that, because Castaneda did not inform the Board of his disability or request an accommodation before the Board decided not to renew and then to terminate him, the Board could not have failed to accommodate his disability. Castaneda argues that the Board had both actual notice, through his oral request for medical leave at the May 6, 2015 investigatory conference and his application for leave filed immediately afterward, and constructive notice, through his "increasingly strange" behavior and actions, which Castaneda contends

were "signs of [his] mental illness." According to Castaneda, because the Board was aware of his disability, it had an obligation to "engage in the interactive process" to identify a reasonable accommodation, but it failed to do so and fired him instead.

"An employee begins the accommodation process by notifying her employer of her disability; 'at that point, an employer's liability is triggered for failure to provide accommodations.'" *Spurling II*, 739 F.3d at 1061 (citation omitted). "After an employee has disclosed that she has a disability, the ADA requires an employer to 'engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances.'" *Id.* (citing *Equal Emp't Opportunity Comm'n v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). "Where notice is ambiguous as to the precise nature of the disability or desired accommodation, but it is sufficient to notify the employer that the employee may have a disability that requires accommodation, the employer must ask for clarification." *Sears*, 417 F.3d at 804. "In other words, an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance, or by intentionally remaining in the dark." *Id.*

Viewing the evidence in the light most favorable to Castaneda, a reasonable jury could conclude that the Board was sufficiently aware of his disability to trigger the interactive process. On May 6, 2015, Castaneda stated during his investigatory conference that the "medical route" the Board's hearing officer had just described to him—in her words, a "medical leave . . . to explore some of the problems he may be having"—was "what [he] would prefer."[5] The Board was aware no later than the next day that Castaneda had applied for short-term disability leave. A week later,

---

[5] This request is arguably vague, but in a case like this one, "involving an employee with mental illness, the communication process becomes more difficult. It is critical that the employer be aware of the difficulties, and 'help the other party determine what specific accommodations are necessary.' [. . .] [A]n employer cannot expect an employee to . . . know that he or she must specifically say 'I want a reasonable accommodation,' particularly when the employee has a mental illness. The employer has to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996) (citations omitted).

Castaneda emailed principal Belanger and Board personnel, stating that he was "seeking the help of a medical provider" and had been staying home from work since the May 6 investigatory conference due to his "medical provider's diagnosis and recommendation." By May 19, 2015, Castaneda's physician submitted a form to the Board's disability benefits administrator indicating Castaneda was unable to work because he was experiencing hallucinations, paranoid ideation, and delusional thoughts. Based on this evidence, a jury could conclude that the Board was aware of Castaneda's condition and his desire to be accommodated, "thus triggering [the Board's] obligation to engage in the interactive process." *Sears*, 417 F.3d at 804.

The Board does not claim that it *never* learned of Castaneda's disability. Instead, the Board makes much of the fact that Castaneda himself was not aware that he had a mental illness until May 8, 2015 (when he saw Pollack and Dr. Johns for the first time), and so it is unreasonable to expect the Board to have known about his disability if Castaneda did not. The Board argues that because it had already decided not to renew and then to terminate Castaneda by that point, it had no obligation to engage in the interactive process to identify a reasonable accommodation for him. The Board's argument, taken to its logical conclusion, suggests that the moment the Board decided not to renew Castaneda's employment, and then later decided to terminate him, its obligations under the ADA vanished altogether. That is not the case. Even after a termination decision or recommendation has been made, or after an employee has been suspended pending termination, an employer is still obligated to engage in the interactive process once the employee notifies the employer of their disability. *Spurling II*, 739 F.3d at 1061-62. Because Castaneda has identified evidence to create a triable issue of fact as to whether the Board was sufficiently aware of his disability to trigger the interactive process, the Court denies the Board's motion on this basis.

### 3. Failure to Reasonably Accommodate

"[W]hile an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable 'if it prevents identification of an appropriate accommodation for a qualified individual.'" *Spurling II*, 739 F.3d at 1062 (quoting *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1024, 1039 (7th Cir. 2013)). Accordingly, Castaneda must "present evidence sufficient to reach the jury on the question of whether [he] was able to perform the essential functions of [his] job with an accommodation." *Id.*; *Basden*, 714 F.3d at 1039. As explained in Section II(a)(i)(1) above, Castaneda has done so, and so the Court denies the Board's motion on this basis.

### b. FMLA Claims

Castaneda alleges that the Board interfered with his rights under the FMLA by denying his application for leave. Under the FMLA, an eligible employee who has a serious health condition that renders him unable to perform his job functions is entitled to twelve workweeks of leave during any twelve-month period. 29 U.S.C. § 2612(a)(1)(D); *Guzman*, 884 F.3d at 638. To establish his FMLA interference claim, Castaneda must show: (1) he was eligible for FMLA protection; (2) the Board was covered by the FMLA; (3) he was entitled to take leave under the FMLA; (4) he provided sufficient notice of his intent to take leave to the Board; and (5) the Board denied him FMLA benefits to which he was entitled. *Spurling II*, 739 F.3d at 1062. The only element at issue here is whether Castaneda provided the Board with sufficient notice of his intent to take FMLA leave.

### i. Actual Notice

Typically, an employee must give notice of the need for FMLA leave at least 30 days in advance. However, if the need for leave is not known in advance, an employee may give notice "as soon as practicable under the facts and circumstances of the particular case." *Guzman*, 884

F.3d at 639 (citing 29 C.F.R. 825.303(a)). "The notice requirements of the FMLA are not onerous. An employee need not expressly mention the FMLA in his leave request or otherwise invoke any of its provisions." *Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006). "The employee's primary duty in notifying his employer is to provide enough information to the employer 'to show that he *likely* has an FMLA-qualifying condition.'" *Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012) (emphasis in original) (citation omitted); *see also Guzman*, 884 F.3d at 639 ("[T]he employee's duty is merely to place the employer on notice of a probable basis for FMLA leave.") (quotation omitted).

In his opening brief, Castaneda claims he notified the Board of his need for FMLA leave "mere hours after" the May 6, 2015 investigatory conference, when he submitted his application for short-term disability leave and FMLA leave to Sedgwick. He also points to the May 7, 2015 email in which Krieger notes that his leave application "may change the analysis" regarding the Board's termination recommendation, which Castaneda claims demonstrates the Board's knowledge of his medical condition. He also cites the email from the same day when Belanger wonders if Castaneda's "family/friends finally got through to him that something was truly wrong with his mental state." In response, the Board cites *Guzman* and argues that Castaneda's request for leave came after the Board had already decided to terminate him, which "vitiates any actual notice claim."[6] The Board also points to dozens of facts regarding the communications at issue, Castaneda's previous behavior, Castaneda's understanding of his disability, and his treatment by

---

[6] *Guzman* does not stand for the proposition that an employer's decision to terminate an employee "vitiates any actual notice claim." In *Guzman*, it was disputed whether the employee requested FMLA leave before or after she was informed that she was being terminated. 884 F.3d at 640-41. That dispute was ultimately irrelevant, because it was undisputed that the employer had decided to terminate the employee before the FMLA request was made. *Id.* That decision did not "vitiate [the] notice claim," however—it demonstrated that the employee was not entitled to FMLA benefits, because the employer could prove that it would have made the same decision to terminate even if the employee had not exercised her FMLA rights. *Id.* The timing of the employer's decision to terminate had no bearing whatsoever on whether the employee provided sufficient actual notice. *Id.*

both Pollack and Dr. Johns. On reply, Castaneda changes his tune and argues that he provided the Board with actual notice *during* the investigatory conference, when he claims that he "explicitly" told the Board's hearing officer that "he wanted to take medical leave to address his mental state." Castaneda claims that this fact is undisputed, but that is decidedly not the case. The Board forcefully contests whether the exchange between Castaneda and Ernesti constituted a request for leave. Dkt. 70 ¶ 12.

Even if Castaneda's theory of actual notice had not shifted mid-briefing, this is a question for a jury. The "notice inquiry is a 'fact-rich question . . . perhaps best resolved by the trier of fact, particularly, where, as is the case here, the employer and employee dispute the quantity and nature of communications regarding the employee's illness." *Pagel v. TIN Inc.*, 695 F.3d 622, 628 (7th Cir. 2012). A reasonable jury could conclude that Castaneda's exchange with Ernesti during the investigatory conference provided the Board with enough notice to show that he likely had an FMLA-qualifying condition, or that Belanger's email reference the next day to Castaneda's "mental state" shows his awareness of Castaneda's medical condition. But a reasonable jury could just as easily find that Belanger's email was instead referring to Castaneda's poor attitude, and that his exchange with Ernesti at the investigatory conference was too vague and disjointed to rise to the level necessary to put the Board on notice that he had a serious medical condition. Because the evidence presented would permit either result, the Court denies both parties' motions on this basis.

### ii. Constructive Notice

Castaneda also argues that the Board was on constructive notice of his need for FMLA leave. In some circumstances, an employee's "dramatic change in behavior" may serve as "notice of a medical problem." *Byrne v. Avon Products*, Inc., 238 F.3d 379, 381 (7th Cir. 2003). Castaneda relies extensively on *Byrne* and argues that his behavior, like the plaintiff's in *Byrne*, put

his employer on constructive notice of his need for FMLA leave. He cites behavior from October 2014 through May 2015 (a span of eight months), noting the incidents in which he was observed standing on his desk, staring out the window and ignoring his students, giggling in response to a question from vice principal Roman, and failing to control his classroom, among others, as well as various statements from his colleagues and a student's parent describing his behavior and demeanor as "erratic," "peculiar, off, increasingly strange and bizarre," and "not with it."

The Board argues that this is not the sort of "stark" and "dramatic" change that gives rise to a constructive notice claim. In *Byrne*, the plaintiff had been a "model employee" with more than four years on the job, and the events and behavior at issue to his constructive notice claim occurred in less than a month. 328 F.3d at 380-81. The Board also points out that Castaneda offered non-medical explanations for his behavior and poor performance throughout the school year, and argues that such non-medical reasons undercut any potential constructive notice provided by his behavior.

Here too, a reasonable jury could accept either version of events. Castaneda's behavior was stark enough to alarm many of his colleagues and cause them to approach school leadership with their concerns. There are no indications in the record that Castaneda behaved similarly during the previous school year, or even at the beginning of the 2014-2015 school year. A reasonable jury could find that change in behavior dramatic enough to put the Board on notice. But a reasonable jury could also view the same evidence and conclude that Castaneda's behavior changes were too gradual to give rise to constructive notice, or that his non-medical explanations were enough to dispel such notice. Because a reasonable jury could find for either party on this question, the Court denies both parties' motions on this basis.

### iii. Denial of FMLA Benefits

To prevail on his FMLA claim, Castaneda must establish, "by a preponderance of evidence, that he was entitled to the benefits he claims." *Pagel*, 695 F.3d at 629. The Board "may present evidence to show that the employee would not have been entitled to his position even if he had not taken leave." *Id.* (citation omitted). In other words, "employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave." *Id.* (citation omitted). To survive summary judgment, Castaneda must overcome any such evidence offered by the Board. *Id.* (citation omitted).

An employee cannot establish that he is entitled to FMLA benefits if it is undisputed that an employer decided to terminate an employee before the employee requested FMLA leave, or before the employer became aware of the employee's medical condition. *Guzman*, 884 F.3d at 640.[7] The Board argues that that is the case here—that it decided not to renew and then to fire Castaneda before he requested FMLA leave and before the Board was aware of his medical condition, and so Castaneda was never entitled to FMLA benefits. That is only partially true. It is undisputed that the Board decided not to renew Castaneda before he requested FMLA leave, but it is disputed whether the Board was otherwise aware of his medical condition by the time it decided not to renew and later to fire him. Indeed, as noted above, the parties have raised genuine disputes on this question, and so the Court denies the motions on this basis.

---

[7] The timing of an employer's decision to terminate figures different in the analysis of an FMLA interference claim than it does in the analysis of an ADA disparate-treatment claim or failure-to-accommodate claim. *Compare Guzman*, 884 F.3d at 639-40, *and Spurling II*, 739 F.3d at 1060-61.

## III.    CONCLUSION

For the foregoing reasons, the Board's motion for summary judgment [57] is denied.  Castaneda's partial motion for summary judgment [49] is denied.  The parties will proceed to trial on Castaneda's claims.

Virginia M.  Kendall
United States District Judge

Date: March 25, 2019