## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| SAUL CASTANEDA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No.  16 C 10167 |
| | ) | |
| | ) | Judge Virginia M. Kendall |
| BOARD OF EDUCATION OF THE | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Saul Castaneda sued Defendant Board of Education of the City of Chicago claiming violations of the Americans with Disabilities Act and the Family Medical Leave Act. (*Id.*). This Court denied the Board's motion for summary judgment determining that there were disputed issues of material fact that needed to be decided by a jury. The jury trial began August 26, 2019. (Dkt. 129). On September 6, 2019, the jury found in favor of the Board on all three of Castaneda's claims, (Dkt. 131) and this Court entered judgment on the same day, (Dkt. 132). Castaneda filed this Motion for a New Trial under Federal Rule of Civil Procedure 59(a), or in the alternative, to Alter or Amend the Judgment on his FMLA claims under Federal Rule of Civil Procedure 59(e). (Dkt. 141 at 1). For the following reasons, Castaneda's motion is denied.

## BACKGROUND

Castaneda was a second-grade bilingual education teacher at Hanson Park Elementary School ("Hanson Park"), part of Chicago Public Schools ("CPS"), from 2013 to 2015. (Dkt. 135 at 45 ¶¶ 5–6; 74 ¶¶ 9–10). During the 2013 to 2014 school year, Castaneda met expectations and was invited back to teach for a second year. (*Id.* at 47 ¶¶ 20–22; 54 ¶ 12–14). But as the 2014 to 2015 school year progressed, Castaneda's job performance gradually declined, and his behavior became increasingly strange. (*Id.* at 234 ¶¶ 20–23; 259 ¶¶ 3–15; 856 ¶¶ 17–21). On April 17, 2015, a colleague observed Castaneda standing on a ledge or a desk in his classroom, not attending to the students. (*Id.* at 645 ¶¶ 16–648 ¶¶ 22). That same month, two students were injured under Castaneda's supervision. (*Id.* at 956 ¶¶16–25; 957 ¶¶ 1–22).

After these incidents, Principal David Belanger and Assistant Principal Esmerelda Roman escalated their concerns to the Office of Employee Engagement ("OEE"). (*Id.* at 958 ¶¶ 5–9). Mr. Thomas Krieger, the Assistant Director of OEE, determined that an investigatory hearing should occur. (*Id.* at 422 ¶¶ 1–8). On May 6, 2015, Ms. Mary Ernesti, a Hearing Officer for OEE, presided over the investigatory conference. (*Id.* at 293 ¶¶ 1–7). Castaneda and his Union Representative, Ms. Annette Rizzo, appeared before Hearing Officer Ernesti. (*Id.* at 102 ¶¶ 20–24).

After the investigatory conference, Castaneda applied for Short-Term Disability ("STD") benefits and FMLA leave through Sedgwick, the third-part responsible for administrating benefits. (*Id.* at 66 ¶¶ 3–13; 401 ¶ 1). Sedgwick

conditionally approved Castaneda's application for FMLA leave that same day, May 6, 2015. (*Id.* at 605 ¶¶ 6–12). The next day, May 7, 2015, the Board suspended Castaneda. (*Id.* at 70 ¶¶ 19–25). Beginning on May 8, 2015, Castaneda sought medical attention. (*Id.* at 67 ¶¶ 20–23). Sedgwick denied Castaneda's application for STD benefits on May 12, 2015. (*Id.* at 111 ¶¶ 8–12). The Board terminated Castaneda's employment on June 26, 2015. (*Id.* at 74 ¶¶ 5–15).

In his Amended Complaint, Castaneda first alleged the Board discriminated against him by not reasonably accommodating his disability and terminating him in violation of the ADA. (Dkt. 16 at 4 ¶¶ 1–5). Second, Castaneda alleged the Board interfered with his right to take leave by denying him leave in violation of the FMLA. (*Id.* at 5 ¶¶ 1–3). Third, Castaneda alleged the Board interfered with his right to take leave by terminating his employment in violation of the FMLA. (*Id.* at 5 ¶¶ 1–3).

The trial began on August 26, 2019. (Dkt. 129). After hearing five days of testimony, jury deliberations began the afternoon of September 5, 2019. (*Id.*). The jury deliberated for approximately forty-five minutes before Court was adjourned. (Dkt. 141 at 1). Jury deliberations resumed at 9:00 AM the next day, on September 6, 2019. (Dkt. 131). At approximately 10:00 AM, the jury submitted four questions to the Court. (Dkt. 135 at 1083 ¶¶ 13–19). After discussing the questions and answers with the Parties and obtaining agreement from them, the Court answered the jury's questions approximately fifteen minutes later. (Dkt. 141 at 1). At approximately 11:00 AM, the jury reached a verdict on all three claims. (Dkt. 141 at 1). The jury returned a verdict in favor of the Board on all three claims. (Dkt. 134). Castaneda

timely filed this Motion to Alter or Amend the Judgment and/or for a New Trial. Fed. R. Civ. P. 59(b), (e); Dkt. 141.

## I.    MOTION FOR A NEW TRIAL ON CASTANEDA'S FMLA AND ADA CLAIMS

Castaneda moves for a new trial on both his FMLA and ADA claims under Rule 59(a), arguing the jury's decision was against the manifest weight of the evidence and a substantial injustice would occur if the verdicts were allowed to stand.  (Dkt. 141 at 1). For the reasons discussed below, Castaneda's motion for a new trial is denied.

### LEGAL STANDARD

Castaneda first brings a Motion for a New Trial. Rule 59(a) authorizes the Court to grant a new trial as to some or all issues that were tried to a jury. *See* Fed. R. Civ. P. 59(a)(1)(A). The movant bears a "particularly heavy burden" of establishing the need for a new trial. *Marcus & Millichap Inv. Servs. of Chicago, Inc. v. Sekulovski*, 639 F.3d 301, 314 (7th Cir. 2011) (citations omitted). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014); *see also Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004). "The ruling on a motion for a new trial is a matter committed to the district court's discretion." *Galvan v. Norberg*, 678 F.3d 581, 588 (7th Cir. 2012); *see also Research Sys. Corp. v. IPSOS Publicite*, 276 F.3d 914, 921 (7th Cir.2002) (citation and internal quotation marks omitted) ("The district court, having seen the presentation of the evidence and observed the witnesses, is in a unique position to rule on a new trial motion.").

## DISCUSSION

In support of his Motion for a New Trial, Castaneda argues that the jury's verdicts on both his FMLA and ADA claims were against the manifest weight of the evidence. (Dkt. 141 at 2, 9). When determining whether the jury's verdict is against the manifest weight of the evidence, the Court "view[s] the evidence in the light most favorable to the prevailing party . . ." *Barrington Music Prods., Inc. v. Music & Arts Ctr.*, 924 F.3d 966, 968 (7th Cir. 2019) (quoting *Kapelanski v. Johnson*, 390 F.3d 525, 530 (7th Cir. 2004)). The Court should be "particularly careful in employment discrimination cases to avoid supplanting [its own] view of the credibility or weight of the evidence for that of . . . the jury . . ." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (quoting *Hybert v. The Hearst Corp.*, 900 F.2d 1050, 1054 (7th Cir. 1990)). The Court "cannot grant a new trial just because it believes the jury got it wrong" or "merely because the evidence was sharply in conflict." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012) (citation and internal quotation marks omitted).

When considering whether the jury's verdict goes against the manifest weight of the evidence, a court analyzes the "general sense of the evidence, assessing the credibility of the witnesses and the comparative strength of the facts put forth at trial." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) (citing *Mejia v. Cook Cnty.*, 650 F.3d 631, 633 (7th Cir. 2011). Simply because a movant can present evidence that is "inconsistent with the jury's verdict does not mean that the verdict should be reversed." *Lowe v. Consol. Freightways of Del., Inc.*, 177 F.3d 640, 643 (7th Cir. 1999).

There are narrow circumstances where a verdict will be set aside, namely "if 'no rational jury' could have rendered the verdict;" the "jury's verdict resulted in a miscarriage of justice;" or "where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Moore ex rel. Estate of Grady v. Tuelja*, 546 F.3d 423, 427 (7th Cir. 2008) (quoting *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006); *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (citations omitted). Finally, "[j]ury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Tuelja*, 546 F.3d at 427 (citation omitted). The Court shall uphold a jury verdict "as long as a reasonable basis exists in the record to support [the] verdict." *Pickett*, 610 F.3d at 440.

A. **The Jury's Verdict on Castaneda's FMLA Claims Was Not Against the Manifest Weight of the Evidence**

On Castaneda's FMLA claims, the Court instructed the jury:

> To succeed on his FMLA interference claim, Mr. Castaneda must prove each of the following propositions by a preponderance of the evidence: 1. Mr. Castaneda was eligible for FMLA leave; 2. Mr. Castaneda had a mental health condition; 3. Mr. Castaneda's mental health condition was a serious health condition; 4. The Board had appropriate notice of Mr. Castaneda's need for leave; 5. The Board interfered with Mr. Castaneda's right to take FMLA leave by denying him FMLA leave and/or by terminating him.

### i.    Whether Castaneda Was Eligible for FMLA Leave

The first element Castaneda had the burden to prove by a preponderance of the evidence was "that Castaneda was eligible for FMLA leave." (Dkt. 130 at 13).  In addition, the Court instructed the jury: "To be eligible for FMLA leave, an employee must have worked for the employer from whom he requests leave for at least 12 months and must have worked 1250 hours for that employer during the 12-month period preceding the leave." (Dkt. 130 at 12).

The record shows that there was ample evidence to rebut the claim that Castaneda was eligible for FMLA leave. During trial, Kerry Frank, Senior Customer Service Representative in Human Resources, testified that Castaneda had worked 900 hours for CPS during the preceding twelve months. (Dkt. 135 at 601 ¶¶ 7–13). Frank further testified that Castaneda was a "school-based employee." (*Id.* at 601 ¶¶ 7–8). She added, "We have established a bright line of 900 hours for school-based employees for their hours worked." (*Id.* at 601 ¶¶ 7–13). Based on this testimony, a rational jury could have concluded that Castaneda only worked 900 hours during the preceding year, which is short of the 1250 hours required to be eligible for FMLA leave. Joseph Moriarty, Labor Relations Officer and supervisor of the Equal Opportunity Compliance Office*, Id.* at 542 ¶ 17–543 ¶ 8, additionally testified that the requirement to work 1250 hours during the preceding twelve months is "for somebody who worked 52 weeks. It's a little different for teachers who have a shorter . . . the number of hours that they're required to work are prorated, because they don't work a full year, they only work a 10-month year." (*Id.* at 535 ¶¶ 13–21). Moriarty

did not know the exact number of hours required for the teachers who only work a 10-month year but testified that it was "less than" 1250 hours. (*Id.* at 535 ¶ 25–536 ¶ 7).

When the Court and the Parties discussed the jury instructions for the first element, Castaneda argued that an employee must have worked 900 hours during the 12-month period preceding the leave, instead of 1250 hours. (*Id.* at 901 ¶¶ 2–6). The Board countered that, although the Board's practice is to only require school-based employees to work 900 hours per year, the law requires employees to work 1250 hours. (*Id.* at 901 ¶¶ 7–10). The Court agreed, explaining Castaneda may argue the Board only requires 900 hours, but the law requires 1250 hours. (*Id.* at 901 ¶¶ 14–16). Castaneda conceded, "That's true. We can argue that . . . . We're fine with it." (*Id.* at 901 ¶¶ 17–18). This is an example of a "simple issue[] but highly disputed facts," (citation omitted), to which the "jury verdict[] deserve[s] particular deference." *Tuelja*, 546 F.3d at 427. Therefore, "reasonable basis exists in the record" for a "rational jury" could have concluded that Castaneda was not eligible for FLMA leave and failed to prove the first element by a preponderance of the evidence. *Pickett*, 610 F.3d at 440; *Tuelja*, 546 F.3d at 427 (citation omitted).

## ii.    Whether Castaneda Had a Mental Health Condition

The second element Castaneda had the burden to prove by a preponderance of the evidence was that "Castaneda had a mental health condition." (Dkt. 130 at 13). Castaneda testified that he had "been diagnosed with a mental illness." (Dkt. 135 at 42 ¶¶ 3–9). Dr. Mark Johns, a psychologist, testified that on May 8, 2015, he initially

diagnosed Castaneda with "major depression with psychotic features." (*Id.* at 46 ¶¶ 18–25). Dr. Johns later ruled out schizophrenia and added the diagnosis of "social anxiety disorder." *(Id.* at 149 ¶¶ 1–7). Howard Pollack, a Licensed Clinical Social Worker, testified that he diagnosed Castaneda with "schizophrenic reaction, paranoid type" that same day after receiving a call from Castaneda matter-of-factly describing his symptoms while discussing how he was facing disciplinary action and that Castaneda himself suggested this diagnosis. (*Id.* at 798 ¶¶ 9–10; 799 ¶¶ 1-25; 801 ¶¶ 13–18). On cross-examination, Pollack testified that if he could have, he would have put 'diagnosis deferred' but that he needed to put a diagnosis in and that was why he put in "schizophrenic reaction, paranoid type." (*Id.* at 805 ¶¶ 15–22). Dr. Daniel Litoff, a physician, testified that on January 26, 2015, he "agree[d] with the already diagnosis" of "psychosis," but that he did not observe any psychotic symptoms. *(Id.* at 818 ¶¶ 21–25). Finally, Dr. Morteza Mohajer, a psychiatrist, testified that on June 25, 2016, he diagnosed Castaneda with "psychotic disorder, not otherwise specified*,"* *Id.* at 824 ¶¶ 11–16; 827 ¶¶ 21–23, and was ruling out schizophrenia, *Id.*at 832 ¶¶ 12–15. All of the testimony regarding any mental diagnosis stated that the mental health condition was diagnosed after Castaneda left the school. There was no evidence that Castaneda was aware of a mental health condition, informed his employer of a mental health condition, or sought treatment for a mental health condition until his first visit on May 8, 2015.

While there was evidence that Castaneda suffered from a mental illness, "[t]he fact that [the movant] presented evidence that is inconsistent with the jury's verdict

does not mean that the verdict should be reversed." *Lowe*, 177 F.3d at 643. The Court cannot say that "no rational jury" could have rendered the verdict or that this shocks the conscience considering the conflicting testimony. *Tuelja*, 546 F.3d at 427. In any event, the Court cannot say this resulted in a miscarriage of justice. *Id.* A rational jury may have concluded that Castaneda did have a mental health condition, and he did prove the second element by a preponderance of the evidence. Castaneda, however, must have proven all five elements by preponderance of the evidence to succeed on his FMLA claims. (Dkt. 130 at 12). If a rational jury could have concluded that Castaneda failed to meet his burden of proof for just one of the five elements, the Court will uphold the jury's verdict in favor of the Board. *Pickett*, 610 F.3d at 440. (The Court shall uphold a jury verdict "as long as a reasonable basis exists in the record to support [the] verdict.").

### iii.    Whether Castaneda's Mental Health Condition Was a Serious Health Condition

The third element Castaneda had the burden to prove by a preponderance of the evidence was that Castaneda's "mental health condition was a serious health condition." (Dkt. 130 at 13). The Court's instructions defined "serious health condition" as a "mental condition that involves continuing treatment by a health care provider. To establish continuing treatment by a health provider, Mr. Castaneda must prove that he was unable to work due to the condition and was treated two or more times by a health provider." (*Id.* at 13). Dr. Johns testified that on May 8, 2015, he recommended that Castaneda was "unable to work at this time" and projected Castaneda would be able to "return to work" on September 1, 2015. (Dkt. 135 at 150

10

¶ 25–151 ¶ 8). Moreover, Dr. Johns testified that he treated Castaneda over one hundred times. (*Id.* at 148 ¶¶ 2–6). All of these times were after the time that Castaneda worked for CPD.

However, other witnesses testified conflicting evidence. Dr. Litoff, his primary care physician, testified that he did not observe psychotic symptoms. (*Id.* at 818 ¶¶ 7–9). Pollack testified that Castaneda called him and suggested that he receive a diagnosis of schizophrenic reaction, paranoid type, on the same day that he called Dr. Johns and received a diagnosis. (*Id.* at 799 ¶¶ 23–25; 799 ¶¶ 1–25; 801 ¶¶ 13–18). Pollack further testified that while he recommended Castaneda not return to the classroom, it had little to do with his diagnosis, but rather primarily based this on "what he said about his behavior in the classroom, how he transposed the rules. He decided that he wasn't going to use the lesson plan and he was going to just let the kids socialize." (*Id.* at 806 ¶¶ 14–19). Dr. Mohajer stated that he told Castaneda to stop taking Adderall to see if it affected his psychosis and prescribed other drugs, and that on his next visit he was calmer and denied paranoid or grandiose ideation. (*Id.* at 833 ¶¶ 1–25; 834 ¶¶ 10–12).

Based on Dr. Johns' testimony, a rational jury may have concluded that Castaneda's mental health condition was a serious health condition. However, there was substantial conflicting testimony and no other witness besides Dr. Johns indicated that Castaneda was unable to work because of his mental health issue, which is a key element of the standard. As stated above, "[t]he fact that [the movant] presented evidence that is inconsistent with the jury's verdict does not mean that the

verdict should be reversed." *Lowe*, 177 F.3d at 643. Again, even if the jury could have concluded that Castaneda had a serious mental illness, if a rational jury could have concluded that Castaneda failed to meet his burden of proof for just one of the five elements, the Court will uphold the jury's verdict in favor of the Board.

### iv. Whether the Board Had Appropriate Notice of Castaneda's Need for Leave

The fourth element Castaneda had the burden to prove by a preponderance of the evidence was that "the Board had appropriate notice of Mr. Castaneda's need for leave." (Dkt. 130 at 12). The Court further instructed that Castaneda "must have given the Board at least 30 days' notice before FMLA leave was to begin. If that was not possible, Mr. Castaneda must have given notice as soon as both possible and practical, taking into account all of the facts and circumstances." *(Id.)*. The Board refers to this as "actual notice." (Dkt. 158 at 10). Alternatively, the Court instructed that "Mr. Castaneda must have given at least verbal notice sufficient to make the Board aware that he needed FMLA leave. Mr. Castaneda did not need to mention the FMLA or use any specific words if he gave the Board enough information that the Board knew, or should have known, that Mr. Castaneda needed FMLA leave. Mr. Castaneda did not need to request FMLA leave if the Board knew or should have known from the circumstances that Mr. Castaneda needed FMLA leave or was so incapacitated that he could not provide notice of his need for leave." (Dkt. 130 at 12–13). The Board refers to this as "constructive notice." (Dkt. 158 at 12). The Court will discuss each in turn.

1.     **Actual Notice**

Castaneda testified that he did not know that he had a mental illness until May 8, 2015, when LCSW Pollack and Dr. Johns diagnosed him, and, consequently, he did not notify anyone at CPS that he had a mental illness prior to that date. (Dkt. 135 at 6 ¶¶ 12–15; 105 ¶¶ 18–23). Therefore, at the time he applied for STD benefits and FMLA leave through Sedgwick, the third-party responsible for administrating benefits on May 6, 2015, Castaneda did not know and could not have notified anyone at CPS that he had a mental illness. *(Id.* at 66 ¶¶ 3–13; 401 ¶ 1). Assistant Director Krieger and Principal Belanger testified that they did not became aware of Castaneda's application for FMLA leave until the next day, May 7, 2015. *(Id.* at 479 ¶¶ 12–17; 734 ¶¶ 15–25; 735 ¶¶ 1–4). Castaneda argues that, as soon as the Board became aware of Castaneda's application for FMLA leave on May 7, 2015, Castaneda *had* given the Board actual notice of his need for leave "as soon as both possible and practical." (Dkt. 141 at 5; Dkt. 131 at 12). However, based on the evidence, the Court cannot say that the jury unreasonably found that there was no notice. Here, the facts are highly disputed, and "[j]ury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'" *Tuelja*, 546 F.3d at 427.

2.     **Constructive Notice**

Castaneda contends that even if the Board did not have actual notice before May 7, 2015, other incidents leading up to the Castaneda's application for FMLA leave put the Board on constructive notice of his need for leave. (Dkt. 141 at 5–6). This was precisely why the Court denied summary judgment.  The facts were highly

conflicting and the jury was needed to judge the credibility of the witnesses. For example, Principal Belanger testified that he had an "inkling" that Castaneda did not have a "typical" mental state as early as January 14, 2015. (Dkt. 135 at 696 ¶ 14–697 ¶ 16) (emphasis added). But Belanger clarified that by "mental *state*" he meant Castaneda's "state of mind," and that he "had no inkling that Mr. Castaneda had any kind of mental *illness.*" *(Id.* at 737 ¶¶ 10–11; 697 ¶¶ 10–11) (emphasis added). Principal Belanger also testified that Castaneda stated he was "burnt out" from the previous school year. *(Id.* at 771 ¶¶ 17–19). On April 22, 2015, Principal Belanger emailed Assistant Director Krieger to ask whether Castaneda should be sent for a Fitness-for-Duty evaluation, which would have included a medical evaluation. *(Id.* at 726 ¶¶ 9–12; 727 ¶¶ 21–24; 755 ¶¶ 2–6.) According to Principal Belanger, Assistant Director Krieger chose to follow the disciplinary route instead of the fitness-for-duty route. *(Id.* at 728 ¶¶ 4–22.)

Shelley Eckerman and Dawn Ghawaly ("Ghawaly"), teachers at Hanson Park, and Assistant Principal Roman, each testified that Castaneda's job performance gradually declined and his behavior became increasingly strange as the school year progressed. (*Id.* at 234 ¶¶ 20–23; 259 ¶¶ 3–15; 856 ¶¶ 17–21). According to Assistant Principal Roman's testimony, however, Castaneda never voiced any concerns or asked for help. (*Id.* at 873 ¶¶ 16–20). Tammy Siegel, Case Manager at Hanson Park, testified that on April 17, 2015, she observed Castaneda standing on a ledge or on a desk and was "very concerned" about his "spacey" behavior. *(Id.* at 646 ¶¶ 19–25; 648 ¶¶ 11–22). She immediately informed Principal Belanger. *(Id.* at 648 ¶¶ 11–22).

Hearing Officer Ernesti testified that during the investigatory conference on May 6, 2015, Castaneda "said he wanted to go the medical leave route." *(Id.* at 310 ¶¶ 10–19). Hearing Officer Ernesti further testified that Union Representative Rizzo mentioned Castaneda's "mental state" at the investigatory conference. *(Id.* at 301 ¶¶ 8). However, Hearing Officer Ernesti testified that during the investigatory conference, neither Rizzo nor Castaneda discussed how Castaneda's "mental state" related to the conduct under investigation. (*Id.* at 359 ¶¶ 1–10). Union Representative Rizzo only stated that Castaneda was "sleep-deprived because of the demands of his job." *(Id.* at 358 ¶¶ 9–11). Moreover, Castaneda understood and responded to the questions asked of him, remained "calm," and maintained a "steady tone of voice." (*Id.* at p. 363 ¶¶ 12–17).

Castaneda contends that even if the Board did not have actual or constructive notice before May 7, 2015, other incidents after Castaneda's application for FMLA leave put the Board on constructive notice of his need for leave before its decision to terminate him on June 24, 2015. (Dkt. 141 at 5–6). On May 14, 2015, Castaneda emailed Assistant Director Krieger and Labor Relations Officer Moriarty to inform them he had applied for STD benefits and FMLA leave on May 6, 2015 and had received a diagnosis from a medical provider. (Dkt. 141-1 at 62). Dr. Johns testified that he faxed Castaneda's diagnosis and recommended return-to-work date to CPS on May 19, 2015. (Dkt. 135 at 149 ¶¶ 11–25; 150 ¶¶ 1–8; Dkt. 141-1 at 64–65). Lastly, on June 10, 2015, Castaneda emailed Principal Belanger. (Dkt. 141-1 at 67).

Based on this testimony, a rational jury could have viewed the above-cited testimony and concluded that the decline in performance and change in behavior was too gradual to give rise to constructive notice, or that failure to voice any concerns and his sleep-deprivation and burn-out explanations were enough to dispel such notice. There is not enough evidence to say that the Board was certainly on notice of Castaneda's mental state or that the jury went against the preponderance of the evidence. While there is evidence that suggests that the Board could have had constructive notice, there is also substantial evidence that the Board did not have this notice. This is a fact-intensive process and the Court will not disturb the jury's findings unless it can be shown there was manifest error, which Castaneda cannot do. The Court "cannot grant a new trial just because it believes the jury got it wrong" or "merely because the evidence was sharply in conflict." *Whitehead*, 680 F.3d at 928. Here, the evidence was undoubtedly in conflict, but Castaneda has only shown there was evidence at odds, not that the jury got it wrong.

**v.** **Whether the Board Interfered with Mr. Castaneda's Right to Take FMLA Leave by Denying Him FMLA Leave and/or by Terminating Him**

The fifth and final element Castaneda had the burden to prove by a preponderance of the evidence was that "the Board interfered with Mr. Castaneda's right to take FMLA leave by denying him FMLA leave and/or by terminating him." (Dkt. 130 at 13). The Parties do not dispute that the Board terminated Castaneda on June 26, 2015. (Dkt. 135 at 74 ¶¶ 5–15). The remaining issue, therefore, is whether the Board interfered with Castaneda's right to take FMLA leave prior to his dismissal.

The Parties do not dispute the following facts: Castaneda applied for STD benefits and FMLA leave on May 6, 2015; Sedgwick conditionally approved Castaneda's application for FMLA leave on May 6, 2015; Sedgwick denied Castaneda's STD benefits on May 12, 2015; Castaneda appealed Sedgwick's denial of STD benefits; and Castaneda's final appeal of Sedgwick's denial of STD benefits was denied in August 2015. (*Id.* at 66 ¶¶ 3–13; 605 ¶¶ 6–12; 111 ¶¶ 8–11; 616 ¶¶ 9–13). Whether Sedgwick ever denied Castaneda's FMLA leave, however, is highly disputed. For example, Frank testified that it was her "understanding that Sedgwick never rendered a verdict about the FMLA leave." (*Id.* at 606 ¶¶ 21). But when asked, "[s]o they denied [Castaneda] leave against the terms of the FMLA…?" she responded, "[t]hat is the Sedgwick process." (*Id.* at 640 ¶¶ 3–5).

Frank testified that Sedgwick evaluates STD benefits before it evaluates FMLA leave. (*Id.* at 606 ¶ 25–607 ¶ 9). Frank further testified that Sedgwick "stalled" considering Castaneda's application for FMLA leave until Castaneda's final appeal for STD benefits was decided in August 2015. *(Id.* at 616 ¶¶ 9–13; 639¶ 24640 ¶ 2). By then, Castaneda had already been terminated, so he was no longer an employee of the Board and thus no longer eligible for FMLA leave. (*Id.* at 606 ¶¶ 16–19). Frank testified, however, that Sedgwick conditionally approved Castaneda's application for FMLA leave from May 6 to June 4, 2015. (*Id.* at 620 ¶¶ 5–8). The Board, however, did not terminate Castaneda until June 24, 2015. *(Id.* at 74 ¶¶ 8–15). Frank concluded that "[t]here should have been a decision about the FMLA." *(Id.* at 640 ¶ 9). This is

another example of a "simple issue[] but highly disputed facts" to which the "jury verdict[] deserve[s] particular deference." *Tuelja*, 546 F.3d at 427 (citation omitted).

Just as a rational jury could have concluded that Sedgwick denied Castaneda's application for FMLA leave, an equally rational jury could have concluded that Sedgwick conditionally approved Castaneda's application for FMLA leave, and by the time Castaneda's appeals for STD benefits were complete, Castaneda was no longer eligible for FMLA leave. For these reasons, reasonable basis exists in the record for a rational jury to have concluded that the Board did not interfere with Castaneda's right to take FMLA leave by denying him FMLA leave, and Castaneda failed to prove the fifth element by a preponderance of the evidence. Although Castaneda argues that he presented "uncontroverted" testimony in support of his FMLA claims, it cannot be said that the jury heard no evidence refuting his allegations. (Dkt. 162 at 1). The Court cannot "grant a new trial merely because the evidence was sharply in conflict." *Whitehead*, 680 F.3d at 928. (citation and internal quotation marks omitted).

In conclusion, Castaneda must have proven all five elements by a preponderance of the evidence to succeed on his FMLA claims. Viewing the evidence in the light most favorable to the Board, there was enough evidence for a rational jury to have concluded that Castaneda failed to meet his burden of proof on at least one of the five required elements, which was enough to return a verdict in favor of the Board. Accordingly, the Court upholds the jury's verdict as not against the

manifest weight of the evidence and denies Castaneda's Motion for a New Trial on these grounds.

**B.    The Jury's Verdict on Castaneda's ADA Claim Was Not Against the Manifest Weight of the Evidence**

On Castaneda's ADA claim, the Court instructed the jury:

> To succeed on his ADA accommodation claim, Mr. Castaneda must prove each of the following propositions by a preponderance of the evidence: 1. Mr. Castaneda had a disability or the Board regarded him as having a disability. 2. Mr. Castaneda was qualified to perform his job. 3. Mr. Castaneda requested an accommodation and/or Mr. Castaneda's disability made it difficult for him to communicate his need for an accommodation. 4. The Board was aware of Mr. Castaneda's disability at the time of his request; however, if the disability made it difficult for Mr. Castaneda to communicate his needs, the Board was required to make a reasonable effort to understand those needs and begin communicating with him if the Board knew he might be mentally disabled. 5. The Board failed to provide Mr. Castaneda with a reasonable accommodation and terminated him.

**i.    Whether Castaneda Had a Disability or the Board Regarded Him as Having a Disability**

The first element Castaneda had the burden to prove by a preponderance of the evidence was that Castaneda "had a disability or the Board regarded him as having a disability." (*Id.*).  In addition, the Court's instructions defined "disability" as "a mental impairment that substantially limits Mr. Castaneda's ability to work;" defined "mental impairment" as "any condition that prevents the mind from functioning normally;" and defined "substantially limit[s]" as "significantly restrict[ing] him from performing a class of jobs, or a broad range of jobs in various classes, compared to someone with similar knowledge, skills, and training. being

19

unable to do a particular job, however, is not by itself a substantial limited on the ability to work." (*Id.* at 17).

As discussed in Part I.A.ii *supra*, the witnesses' diagnoses for Castaneda differed. (*See* "a mental illness," Dkt. 135 at p. 42 ¶¶ 3–9; "major depression with psychotic features" and ruling out schizophrenia, *Id.* at 146 ¶¶ 18–25; "social anxiety disorder" with schizophrenia ruled out, *Id.* at 149 ¶¶ 1–7; "schizophrenic reaction, paranoid type," *Id.* at 801 ¶¶ 13–18; "psychosis," *Id.* at 818 ¶¶ 21–25; and "psychotic disorder, not otherwise specified" and ruling out schizophrenia, *Id.* at 827 ¶¶ 21–23). Because the witnesses' diagnoses differ, a "rational jury" may have debated *which* "mental impairment" Castaneda had during the spring of 2015. Again, not one of these diagnoses came until May 8, 2015 at the earliest.

Moreover, the jury heard evidence that Castaneda's "mental impairment" "substantially limit[ed his] ability to work." Dr. Johns testified that he recommended Castaneda was "unable to work at this time," *Id.* at 150 ¶¶ 25–151 ¶ 2, because Castaneda was "not mentally stable to resume responsibilities [and] work demands of his expected role." (Dkt. 141-1 at 64). However, none of the other witnesses indicated that Castaneda's mental illness was severe enough to preclude working. Once again, the Court cannot say that the jury's verdict goes against the manifest weight of the evidence when assessing the credibility of the witnesses and comparative strength of the facts. *Willis*, 687 F.3d at 836. At most, the Court can say that the evidence here was conflicting, but it cannot say that the evidence presented incontrovertible proof that the jury chose to ignore. Castaneda cannot show that no

rational jury could have found he did not suffer from mental illness, that it shocked the conscience, or that it was a miscarriage of justice. *Tuelja*, 546 F.3d at 427. In any event, Castaneda needed to prove by a preponderance of the evidence that all elements of his claim were met, which as discussed below, he cannot do.

## ii. Whether Castaneda Was Qualified to Perform His Job

The second element Castaneda had the burden to prove by a preponderance of the evidence was that Castaneda "was qualified to perform his job." (Dkt. 130 at 15). The Court's instructions defined "qualified" as having "the skill, experience, education, and other requirements for the job and could do the job's essential functions, either with or without a leave of absence." (*Id.* at 17). The Court further instructed the jury to "only consider Mr. Castaneda's abilities at the time when he was terminated." (*Id.*). The Parties do not dispute that, "at the time [Castaneda] was terminated," he had the "experience" and "education" for his job. He possessed a college degree and was licensed to teach at the elementary school level in the State of Illinois. (Dkt. 135 at 37 ¶¶ 14–21; 39 ¶¶ 8–22).

The Board presented evidence that Castaneda may not, however, have been able to "do the job's essential functions." (Dkt. 130 at 17). Castaneda does not dispute this, instead stating that "there was no factual dispute at trial that Plaintiff had the skill, experience, education, and other requirements of his job as a teacher." (Dkt. 141 at 10). Castaneda leaves out that there is ample evidence showing Castaneda could not do his job's essential functions. Castaneda testified that, according to his job description, his "essential functions" included: "providing lesson plans," "assessing

21

student progress," "establishing and maintaining responsible rules of conduct within the classroom," and "supervis[ing] students." (Dkt. 135 at 87 ¶ 16–89 ¶ 17). Castaneda himself testified that he was "sure" that he was not performing all of the "essential functions" of his job in the spring of 2015. (*Id.* at 89 ¶¶ 18–25). Dr. Johns, Castaneda's psychologist, testified that as of May 8, 2015, Castaneda was "unable to work at this time." *(Id.* at 150 ¶ 25–151 ¶ 2). The jury also heard evidence that Castaneda was unable to provide students with proper instruction or supervision. Ms. Deborah Yaker, a Union Delegate, testified that Castaneda was unable to provide students with proper instruction *(Id.* at 216 ¶¶ 3–13). She further testified that in the spring of 2015, when it was time for Castaneda's second-grade students to move on to the third grade, many of them had to attend additional schooling in order to catch up with their peers. (*Id.* at 216 ¶¶ 9–13). Assistant Principal Roman testified that in the spring of 2015, Castaneda repeatedly arrived at school after 9:00 AM, even though instruction was supposed to begin at 9:00 AM. *(Id.* at 955 ¶¶ 1–17; Dkt. 141-1 at 64). Moreover, Yaker testified that Castaneda was unable to provide students with proper supervision. *(*Dkt. 135 at 217 ¶¶ 2–3). Assistant Principal Roman testified that in April 2015, two students were injured in Castaneda's classroom. (*Id.* at 956 ¶16–957 ¶ 22). Given the substantial testimony by Castaneda himself and other witnesses, it is clear that a rational jury could find that Castaneda was unable to perform his "job's essential functions." (Dkt. 130 at 17).

On the issue of whether he was qualified "with or without a leave of absence," *Id.*, Dr. Johns projected Castaneda would be able to "return to work" on September

1, 2015. (Dkt. 135 at 150 ¶ 25–151 ¶ 8). On cross-examination, however, Dr. Johns testified that Castaneda was not able to return to work on September 1, 2015, and required a few more months of treatment before he was able to work again. (*Id.* at 154 ¶ 23–155 ¶ 14). Dr. Johns attributed this delay to Castaneda's termination, which, he testified, caused Castaneda "serious emotional and mental setback." (*Id.* at 154 ¶¶ 5–14). Thus, Castaneda is incorrect that "the jury could not rationally conclude that Plaintiff absolutely needed a months-long leave…" (Dkt. 141 at 10). There is, at best, conflicting evidence that the jury could take into consideration.

### iii. Whether Castaneda Requested an Accommodation and/or Castaneda's Disability Made It Difficult for Him to Communicate His Need for an Accommodation

The third element Castaneda had the burden to prove by a preponderance of the evidence was that Castaneda "requested an accommodation and/or [his] disability made it difficult for him to communicate his need for an accommodation." (Dkt. 130 at 15). The Court's instructions defined "accommodation" as "a change that will allow a person with a disability to perform a job." (*Id.* at 18). "An accommodation is 'reasonable' if it is effective and its costs are not clearly disproportionate to the benefits that it will produce. A reasonable accommodation may include such things as a reasonable leave of absence, a change in work rules, location, equipment, schedules, or assigning non-essential functions of the job to another employee. An employer is not required, however, to excuse the employee from performing the essential functions of the job, or to give one or more of them to another employee. Nor does the employer have to accept lower productivity than is expected of other

employees doing the same job. A brief period of leave to deal with a medical condition may be a reasonable accommodation in some circumstances. However, a medical leave spanning multiple months does not permit the employee to perform the essential functions of his job and he would be deemed unqualified." (*Id.*).

Castaneda argues that he applied for FMLA leave and STD leave on May 6, 2015. (Dkt. 141 at 10, citing Dkt. 135 at 66 ¶¶ 3–13). Castaneda also claims he requested a medical leave during the May 6, 2015 investigatory conference. (Dkt. 141 at 10, citing Dkt. 135 at 301 ¶¶ 1–8; 305 ¶ 5; 306 ¶ 14). While this is uncontroverted, Castaneda does not show how requests for FMLA leave and STD leave are accommodations under the ADA, nor can he since case law indicates that employees who need long-term medical leave and cannot work, such as under the FMLA, are not "qualified individuals" under the ADA. *Golden v. Indianapolis Housing Agency*, 698 Fed App'x 835 (7th Cir. 2017). What the record does show is that while Castaneda testified that he knew as early as May 7, 2015 who to contact to file a reasonable accommodation request under the ADA, he did not do so until July 8, 2015, when he requested an accommodation in the form of a "lower stress, reduced stimuli environment" at work. (Dkt. 135 at 113 ¶¶ 5–25; 162 ¶¶ 8–12). By this point, however, Castaneda had already been terminated.

Unable to rely on arguments that he timely requested an accommodation, Castaneda argues that, prior to Dr. Johns's diagnosis on May 8, 2015, Castaneda could not have communicated his need for an accommodation because Castaneda did not know he had a mental disability. (Dkt. 141 at 10; 135 at 146 ¶¶ 18–25). However,

a jury could just as reasonably determine that, because of his email communications throughout the spring of 2015, including his ability to request STD and FMLA leave without issues, Castaneda was able to communicate his needs without difficulty. Reasonable basis exists in the record for a rational jury to have concluded that his disability did not make "it difficult for him to communicate his need for an accommodation," especially given his ability to request other forms a leave. (Dkt. 130 at 15). Therefore, a rational jury could have concluded that Castaneda failed to prove the third element by a preponderance of the evidence.

### iv. Whether the Board was Aware of Castaneda's Disability at the Time of the Request or, if the Disability Made it Difficult for Castaneda to Communicate His Needs, Whether the Board Made a Reasonable Effort to Understand Those Needs and Began Communicating with Him

The fourth element Castaneda had to prove by a preponderance of the evidence was that "[t]he Board was aware of Mr. Castaneda's disability at the time of his request," or "if the disability made it difficult for Mr. Castaneda to communicate his needs, the Board [made] a reasonable effort to understand those needs and beg[a]n communicating with him if the Board knew he might be mentally disabled." (Dkt. 130 at 15).

Relying on many of the same arguments he made for whether the Board had appropriate notice of Mr. Castaneda's need for leave, *see* Part I.A.iv.2 *supra*, Castaneda makes conclusory statements such as "the Board was well aware that [Castaneda] had a medical issue," and "[Castaneda's] mental disability made it impossible to communicate his needs." (Dkt. 162 at 12; Dkt. 141 at 11). These

determinations are fact-intensive inquiries best conducted by a jury and conclusory statements to the contrary do not rebut this. *Tuelja*, 546 F.3d at 427 ("[Jury verdicts deserve particular deference in cases with 'simple issues but highly disputed facts.'") Although Castaneda presented evidence that members of CPS were "concerned" about Castaneda's "mental state" as early as January 2015, the Board presented evidence that no fewer than six members of CPS denied that they knew Castaneda had a mental disability. (*See* Dkt. 135 at pp. 648 ¶¶ 11–22; 696 ¶ 14– 697 ¶ 16; *but see* Dkt 135 at pp. 386 ¶¶ 14–17 (Hearing Officer Ernesti); 697 ¶¶ 10–11 (Principal Belanger); 940 ¶¶ 3–5 (Assistant Principal Roman); 253 ¶¶ 2–11 (Mr. George Costopoulous, a teacher at Hanson Park); 509 ¶¶ 5–12 (Assistant Director Krieger)). The jury weighed the evidence and assessed the credibility of witnesses to arrive at its conclusion, and the Court will not "supplant[ its own] view . . . for that of . . . the jury . . . ." *Pickett*, 610 F.3d at 440 (quoting *Hybert*, 900 F.2d at 1054). There is ample evidence in the record for a rational jury to have concluded that the Board was not "aware of Castaneda's disability at the time of the request." (Dkt. 130 at 15).

Alternatively, "if the disability made it difficult for Mr. Castaneda to communicate his needs," Castaneda had the burden to prove by a preponderance of the evidence that "the Board [made] a reasonable effort to understand those needs and beg[a]n communicating with him if the Board knew he might be mentally disabled." (*Id.*). The Court further instructed "[o]nce an employer becomes aware of an employee's disability and an accommodation has been requested, the employer must discuss with the employee whether there is a reasonable accommodation that

will permit him to perform the job. When an employer knows that an employee might be mentally disabled, the employer should start communicating with the employee. Both the employer and the employee must cooperate in this interactive process in good faith. Neither party can prevail on Mr. Castaneda's failure to accommodate claim simply because the other party did not cooperate in this process. However, you may consider whether a party cooperated in this process in deciding whether a reasonable accommodation existed." (*Id.* at 16).

Castaneda argues that the Board ignored opportunities to initiate the interactive process both before and after the May 6, 2015 investigatory conference. (Dkt. 162 at 12–13). For example, when Principal Belanger emailed Assistant Director Krieger to ask whether Castaneda should be sent for a fitness-for-duty evaluation, which would have included a medical evaluation, Dkt 135 at 727 ¶¶ 21–24; 755 ¶¶ 2–6, Assistant Director Krieger chose to follow the disciplinary route instead. Dkt. 135 at p. 728 ¶¶ 4–22. Assistant Director Krieger testified that he did not believe Castaneda's behavior warranted a fitness-for-duty evaluation. (Dkt. 135 at 445 ¶¶ 2–5). Assistant Director Krieger explained that he "think[s] it's a dangerous thing because of confidentiality to go asking employees if they have a disability issue or to go, you know, probing into an employee's medical conditions if they're not volunteering that type of information." (Dkt. 135 at 436 ¶¶ 15–19). Similarly, Labor Relations Officer Moriarty testified that he "wouldn't have [initiated the interactive process], given that this appears to be a misconduct issue." (Dkt. 135 at 555 ¶¶ 13–18).

Presented with these "highly disputed facts," *Tuelja*, 546 F.3d at 427 (citation omitted), a rational jury could have concluded that Board didn't know he might be mentally disabled and thus wasn't required to make a reasonable effort to understand those needs and begin communicating with him as the jury instructions required. Therefore, a rational jury could have concluded that Castaneda failed to prove the fourth element by a preponderance of the evidence.

**v.    Whether the Board Failed to Provide Castaneda with a Reasonable Accommodation and Terminated Him**

The fifth and final element Castaneda had the burden to prove by a preponderance of the evidence was the Board failed to provide Mr. Castaneda with a reasonable accommodation and terminated him." (Dkt. 130 at 15). As discussed above, on July 8, 2015, Castaneda requested an accommodation in the form of a "lower stress, reduced stimuli environment" at work. (Dkt. 135 at 113 ¶¶ 5-25; 162 ¶¶ 8–12). By this point, however, Castaneda had already been terminated and so the accommodation was not granted.

In conclusion, Castaneda must have proved all five elements by a preponderance of the evidence to succeed on his ADA claim. Viewing the evidence in the light most favorable to the Board, there was enough evidence for a rational jury to have concluded that Castaneda failed to meet his burden of proof on at least one of the five required elements, which was enough to return a verdict in favor of the Board. Although Castaneda argues that he presented "unassailable" testimony in support of his ADA claim, Dkt. 141 at 10, the Board presented evidence refuting his allegations. Even if the evidence is contradictory, "[i]t's the jury's job—not the district court's job

. . . —to figure out who's telling the truth." *United States v. Hassebrock*, 663 F.3d 906, 920 (7th Cir. 2011) (citation omitted). Accordingly, the Court upholds the jury's verdict as not against the manifest weight of the evidence and denies Castaneda's Motion for a New Trial on these grounds.

## II. MOTION TO ALTER OR AMEND THE JUDGMENT ON CASTANEDA'S FMLA CLAIMS

Castaneda moves to alter or amend the judgment for his FMLA claims under Rule 59(e), arguing the jury was plainly confused or mislead by the Court's FMLA jury instructions and that the instructions constitute plain error. (Dkt. 141 at 12, 14). For the reasons discussed below, Castaneda's motion to alter or amend the judgment is denied.

## LEGAL STANDARD

Castaneda moves to alter or amend the judgment on his FMLA claims under Rule 59(e). Rule 59(e) authorizes the Court to alter or amend a judgment "if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *See* Fed. R. Civ. P. 59(e); *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012) (quoting *In re Prince*, 85 F.3d 314, 324 (7th Cir.1996)). The movant bears the burden. *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir.2009). A Rule 59(e) motion is not a "vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *United States v. Resnick*, 594 F.3d 562, 568 (7th Cir. 2010) (citation

and internal quotation marks omitted). Nor is a Rule 59(e) motion an avenue to rehash arguments already considered and rejected by the Court. *See Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000). The decision to grant a Rule 59(e) motion is entrusted to the sound discretion of the district court. *Miller*, 683 F.3d at 813 (citation omitted). A district court reviews its prior judgment under Rule 59(e) to determine whether "there exists 'a manifest error of law or fact,' so as to enable the court to correct its own errors and thus avoid unnecessary appellate procedures." *Divane v. Krull Elec. Co., Inc.*, 194 F.3d 845, 847 (7th Cir.1999) (citing *Moro*, 91 F.3d at 876). A Rule 59(e) motion should be granted only in the "rare" instances where "the Court has patently misunderstood a party . . . or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) ("Such problems rarely arise and the motion to reconsider should be equally rare.")

## DISCUSSION

### A.   Castaneda Failed to Object to the Court's Instructions and Answers

Castaneda argues that he is entitled to a Motion to Amend or Alter Judgment under Rule 59(e) because the Court's jury instructions and the Court's answers to three questions from the jury misled the jury. (Dkt. 141 at 12–14). For the reasons explained below, Castaneda's Rule 59(e) motion on this issue is denied.

### i.   The Court's Jury Instructions

In this case, the Court and the Parties engaged in extensive preparation of jury instructions. Prior to trial, Castaneda did not include language about a time limit for

the Board to process Castaneda's application in his proposed jury instructions. *See generally* Dkts. 80; 81; 82; 107. Castaneda's proposed jury instruction read: "The Board interfered with Mr. Castaneda's right to take FMLA leave by denying *or otherwise failing to give Mr. Castaneda* FMLA leave and then terminating his employment with the Board." (Dkt. 135 at 901 ¶ 22–902 ¶ 14) (emphasis added). The Court instead adopted the Board's proposed instruction, which read: "The Board interfered with Mr. Castaneda's right to take FMLA leave by denying him FMLA leave and/or by terminating him." (*Id.* at 902 ¶¶ 2–14). To which Castaneda replied, "Okay." (*Id.* at 902 ¶ 12). Due to Castaneda's repeated failure to object, a Rule 59(e) motion is inappropriate as he had an opportunity to object during trial. A Rule 59(e) motion is not a "vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *Resnick*, 594 F.3d at 568 (citation and internal quotation marks omitted). Castaneda seeks another bite at the apple by attempting to undo his prior procedural error.

## ii.     The Court's Answers to the Jury's Questions

On September 6, 2015, after the jury had deliberated for approximately one hour, Dkt. 141 at 1, the presiding juror submitted a note to the Court, asking four questions:

> Is CPS required to process FMLA concurrently with STD? Is it illegal that they did not make a ruling on FMLA? If Sedgwick should have processed the FMLA request, is that legally the same as CPS not processing? According to the law, what is the required timeline to process an FMLA request?

(Dkt. 135 at 1083 ¶¶ 13–19.) Castaneda challenges the Court's answers to the jury's first, second, and fourth questions. (Dkt. 141 at 14). When presented with a jury question, the Court must: "(1) fairly and adequately address[] the issues; (2) correctly state[] the law; and (3) answer[] the jury's question specifically." *United States v. Funds in the Amount of $100,120.00*, 901 F.3d 758, 769 (7th Cir. 2018).

In response to the first question, whether "CPS [is] required to process FMLA concurrently with STD," instead of objecting, Plaintiff's counsel replied, "the FMLA doesn't require that at all." (Dkt. 135 at 1083 ¶¶ 22–25). The Court explicitly asked Plaintiff's counsel, "Do you object to the answer of no?" to which Castaneda replied, "I think that's fine, as long as they get the rest, it will come out." (*Id.* at 1087 ¶¶ 16–20). Plaintiff's counsel was presented the opportunity to object, on the record, outside the hearing of the jury, and offer any other alternative, before the Court delivered the answer to the questions presented by the jury, but failed to do so.

In response to the second question, whether "it is illegal that [the Board] did not make a ruling on FMLA?" Plaintiff's counsel initially replied, "Obviously plaintiff says yes." (*Id.* at 1084 ¶¶ 6–9). After a period of discussion, the Court proposed: "The second answer is: It is your job to determine if there was a violation of the law. Anybody object to that one?" to which Plaintiff's counsel replied, "No." (*Id.* at 1087 ¶¶ 21–24). Again, Plaintiff's counsel was presented the opportunity to object, on the record, outside the hearing of the jury, before the Court delivered the answers to the jury's questions, but failed to do so.

In response to the fourth question, "what is the required timeline to process an FMLA request," Plaintiff's counsel replied, "There is no timeline within the text of the law . . . . it's just as reasonably—as soon as possible, really . . . ." (*Id.* at 1085 ¶¶ 1–7). After the Court proposed answering: "You have not been provided a timeline and should reread [the] instruction[s] . . . on FMLA," Plaintiff's counsel replied: "[M]y understanding is it just has to be processed as quickly as possible." (*Id.* at 1088 ¶ 21– 1089 ¶ 4). But when the Court explicitly asked Plaintiff's counsel, "[D]id you want to say something other than what I have said?" Plaintiff's counsel did not reply in the affirmative. (*Id.* at 1089 ¶¶ 16–23). In fact, Plaintiff's counsel provided the Court with the page numbers so that the Court could direct the jury to reread the relevant portion of the jury instructions. (*Id.* at 1090 ¶¶ 12–18). Once again, Plaintiff's counsel was presented the opportunity to object, on the record, outside the hearing of the jury, before the Court delivered the answer to the jury questions, but failed to do so. Most importantly, the answer to the questions was the correct statement of law.

A motion to alter or amend the judgment is not a "vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to . . . advance arguments that could and should have been presented to the district court prior to the judgment." *Resnick*, 594 F.3d at 568 (citation and internal quotation marks omitted). Castaneda's counsel was presented several opportunities to object, on the record, outside the hearing of the jury, both before trial and during trial. Because they failed to do so, he is not entitled to an alteration or an amendment of the judgment under 59(e).

**B.     The Court's Answers to the Jury's Questions Did Not Confuse or Mislead the Jury**

In general, the District Court has discretion in fashioning jury instructions that accurately state the law and do not confuse the jury. *Schobert v. Illinois Dept. of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002). A movant is entitled to a new trial based on jury instruction issues "if the instructions did not sufficiently inform the jury of the applicable law *and* the instructions prejudiced the [movant]." *E.E.O.C. v. AutoZone, Inc.*, 809 F.3d 916, 922 (7th Cir. 2016). Accordingly, even where the jury is confused or misled, a new trial is warranted only where there is evidence that the movant was prejudiced by the improper jury instruction. *See Jiminez v. City of Chicago*, 732 F.3d 710, 717 (7th Cir. 2013). The Court's instructions need not be an "idealized set of perfect jury instructions," but they must be "correct legal statements" and a reviewing court will not reverse a jury verdict unless the instruction is "so misleading that a party was prejudiced." *Schobert*, 304 F.3d at 730.

In his Motion to Alter or Amend the Judgment, Castaneda indicates that, pursuant to the FMLA, "[w]hen the employer has enough information to determine whether the leave is being taken for a FMLA-qualifying reason (e.g., after receiving a certification), the employer must notify the employee whether the leave will be designated and will be counted as FMLA leave within five business days absent extenuating circumstances," 29 C.F.R. § 825.300(d)(1) (2019), and that failure to do so "may constitute an interference with . . . or denial of the exercise of an employee's FMLA rights." (Dkt. 141 at 13 citing 29 C.F.R. § 825.300(e) (2019)).

Assuming, *arguendo*, that Castaneda did not waive his right to raise this issue and that it was error for the Court to have not included this regulatory notification requirement in its answers to the jury's questions, the Court's answers to the jury's questions did not mislead or confuse the jury. To the contrary, the Court clarified to the jury, "[y]ou have not been provided a timeline." (Dkt. 135 at 1088 ¶¶ 21–25; 1089 ¶¶ 1–25). The Court further instructed the jury to reread the relevant portion of the jury instructions, *id.* at 1090 ¶¶ 12–14, and the jury did not ask any more questions. "[A] jury is presumed to understand a judge's answer to its question," just as it is "presumed to follow [a judge's] instructions." *See Waddington v. Sarausad*, 555 U.S. 179, 196 (2009) (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)) ("Where a judge "respond[s] to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry," and the jury asks no follow-up question, this Court has presumed that the jury fully understood the judge's answer and appropriately applied the jury instructions."). Importantly, even if they were given the instruction about the regulatory period, there was evidence in the record presented to the jury that the FMLA leave was granted immediately on the first day. The jury could have easily reached the conclusion that any five day period was met by Sedwick's testimony indicating that he granted the leave conditionally on May 6, 2015. The issue of five days' notice is a moot issue if Castaneda applied for it (showing his knowledge that he could) and it was conditionally granted the very day that he applied.

Similarly, Castaneda was not prejudiced by the alleged error because the jury likely would have reached the same verdict absent the alleged error. *Jiminez*, 732 F.3d at 717. The fifth and final element Castaneda had the burden to prove by a preponderance of the evidence was that "the Board interfered with Mr. Castaneda's right to take FMLA leave by denying him FMLA leave and/or by terminating him." (Dkt. 130 at 12). Had the Court informed the jury that the Board was required to notify Castaneda of his eligibility to take FMLA leave within five business days, and that failure to do so "may constitute an interference with" Castaneda's FMLA rights, a reasonable jury may have found in favor of Castaneda on the fifth element of his FMLA claims. The jury, however, heard testimony that Sedgwick conditionally approved Castaneda's application for FMLA leave on May 6, 2015, the same day Castaneda applied. (Dkt. 135 at 605 ¶¶ 6–12). An equally reasonable jury may have determined that this conditional approval satisfied the regulatory notification requirement and found in favor of the Board on the fifth element of his FMLA claims.

Regardless, as discussed in Part I.A., *supra*, Castaneda, must have proven all five elements by preponderance of the evidence to succeed on his FMLA claims. Even if this alleged error caused the jury to find in favor of the Board on the fifth element, there was reasonable basis in the record for the jury to have found in favor of the Board on the remaining four elements. Therefore, absent the alleged error, the verdict likely would have been the same. Although Castaneda was, evidently, not aware of this regulatory notification requirement at the time of trial when he insisted "[t]here is no timeline within the text of the law," (*Id.* at 1085 ¶¶ 1–7), Castaneda cannot use

his Motion to Alter or Amend the Judgment as a "vehicle" to "advance arguments that could and should have been presented to the district court prior to the judgment." *Resnick*, 594 F.3d at 568 (citation and internal quotation marks omitted). The record shows Castaneda had ample opportunity to bring up these arguments during trial but failed to do so. He cannot use a 59(e) motion to cure his own procedural and legal deficiencies.

Most importantly, Castaneda uses this newly enlightened position of a five day turn around period for FMLA leave to demonstrate that the jury would have reached the wrong result. This simply cannot be said to be the case when other evidence presented to the jury demonstrated that he was immediately and conditionally granted the leave he was requesting. Castaneda has not demonstrated that the Court's instructions or answers misled or confused the jury *and* that Castaneda was prejudiced by the Court's alleged error. *AutoZone, Inc.*, 809 F.3d at 922. Absent this showing, the Court denies Castaneda's Motion to Alter or Amend the Judgment on these grounds.

## C. The Court's Instructions and Answers Did Not Constitute Plain Error

Castaneda argues that the Court's instructions and answers constitute plain error. (Dkt. 141 at 15). Castaneda cannot overcome his steep burden to show plain error, especially due to his repeated waiver of objections. "When a party waives an objection at trial, only seldom may the waiver be overcome, and even then only at the discretion of the court with a strong showing of plain error." *Walker v. Groot*, 867 F.3d 799, 807 (7th Cir. 2017). "In most civil cases, plain error review is unavailable; if a

party fails to object at trial, the issue cannot be raised on appeal. A narrow exception to this general rule permits review where a party can demonstrate that (1) exceptional circumstances exist, (2) substantial rights are affected, and (3) a miscarriage of justice will result if the doctrine is not applied." *Perry v. City of Chicago*, 733 F.3d 248, 253 (7th Cir. 2013) (citations omitted) (declining to perform plain error review of a civil case). Substantial rights may have been affected if the "outcome probably would have been different without the error." *United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005) (citations omitted). A miscarriage of justice may result if "the fairness, integrity, or public reputation of judicial proceedings" is negatively impacted. *Higbee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. 2006).

Castaneda has not demonstrated any "exceptional circumstances" that prevented him from learning about the regulatory notification requirement prior to trial or prevented him from objecting to the Court's instructions or answers during trial. To the contrary, the Court explicitly asked Castaneda several times if he had any objections. First, the Court explained to the Parties, "I'm going to propose something and give you options to object. Okay?" (Dkt. 135 at 1085 ¶¶ 8–9). On another occasion, the Court explicitly asked Castaneda, "Do you object to the answer of no?" (*Id.* at 1087 ¶¶ 16–20). Later, the Court asked, "Anybody object to that one?" (*Id.* at 1087 ¶¶ 21–24). Finally, the Court asked, "did you want to say something other than what I have said?" (*Id.* at 1089 ¶¶ 16–23).

Similarly, Castaneda has not demonstrated his "substantial rights" were affected. As discussed above, absent the alleged error, the jury likely would have

reached the same verdict. Lastly, Castaneda has not demonstrated that "a miscarriage of justice will result." Castaneda argues that the Court's omission of the regulatory notification requirement permitted the Board to "escape liability" for failing to "notify [Castaneda] whether the leave will be designated and will be counted as FMLA leave without five business days." (Dkt. 141 at 13 citing 29 C.F.R. § 825.300(d)(1)(2019)). A reasonable jury, however, may have determined that Sedgwick's conditional approval of Castaneda's application for FLMA leave satisfied the regulatory notification requirement and found in favor of the Board on the fifth element of his FMLA claims.

Castaneda has not demonstrated the existence of exceptional circumstances, that the Court's instructions or answers affected his substantial rights, or that a miscarriage of justice will result. *Perry*, 733 F.3d at 253. Accordingly, Castaneda has not "cleared the high bar of plain error," and the Court denies his Motion to Alter or Amend the Judgment on these grounds. *Groot*, 867 F.3d at 807. As stated throughout, Rule 59(e) does not allow Castaneda to re-do his own errors. He could have objected to the jury instructions and jury answers but failed to do so despite ample opportunity. He is thus not entitled to amend or alter the judgment on any of the arguments he makes.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court denies Castaneda's Motion for a New Trial on his ADA and FMLA claims under Rule 59(a) and his Motion to Amend or Alter the Judgment on his FMLA claims under Rule 59(e) [Dkt. 141].


_____
Virginia M. Kendall
United States District Judge

Date: May 4, 2020